Opinion
 

 MORENO, J.
 

 We granted the request of the United States Court of Appeals for the Ninth Circuit to answer two questions of law. (Cal. Rules of Court, rule 29.8.) (1) Can the Attorney General pursue civil remedies, under the California False Claims Act (CFCA) (Gov. Code, § 12650 et seq.) and the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.) concerning the assets of an insolvent insurance company for which the Insurance Commissioner is acting as conservator or liquidator, or does the Insurance Code, particularly section 1037, give exclusive authority to the Insurance Commissioner to bring civil actions? (2) Do assets to which the Insurance Commissioner acquires title from an insolvent insurance company under Insurance Code section 1011 constitute “state funds” within the meaning of the CFCA?
 

 
 *1289
 
 Answering the second question first, we conclude that the Insurance Commissioner (Commissioner), as a conservator of the insolvent insurance company’s assets, holds these assets in trust for private parties, primarily the insurance company’s policyholders. These assets do not become “state funds” within the meaning of Government Code section 12650. The CFCA does not apply because it was intended to prevent false requests or demands that impact the public treasury.
 

 Turning to the first question, we conclude that the Attorney General may not pursue an action under the CFCA because the assets in question are not “state funds” within the meaning of the CFCA. As to the UCL claims, as explained below, these claims must be parsed according to the type of remedies sought. The Attorney General seeks to pursue three remedies under the UCL: restitution, civil penalties, and injunctive relief. The first, restitution from the losses resulting from the allegedly fraudulent acquisition of the insolvent insurance company’s assets, trespasses directly on the core function of the Commissioner as conservator of the company. We conclude the Attorney General may not, consistent with Insurance Code section 1037 subdivision (f), pursue such a remedy. In pursuing the second remedy, civil penalties based on defendants’ allegedly unlawful conduct in violating state and federal statutes, the Attorney General acts primarily in his role as the state’s chief law enforcement officer, seeking to punish and deter unlawful conduct. We conclude that the Attorney General may pursue such a remedy under the UCL. Third, the Attorney General seeks injunctive relief, but the object of the injunctive relief is unclear from the record. As explained,
 
 post,
 
 he may pursue that relief only to the extent that it implicates core law enforcement functions rather than duplicating the role played by the Commissioner as conservator of the insolvent company.
 

 I. Statement of Facts
 

 We state the facts as they appear in the Ninth Circuit’s request to this court. Because the case came to the Ninth Circuit as a motion to dismiss, its statement of the facts is based on the Attorney General’s pleadings. They are as follows:
 

 More than a decade ago, Executive Life Insurance Company (ELIC), a California insurance company with approximately 300,000 insureds, became insolvent when many policyholders cashed out their policies because of concerns about ELIC’s large junk bond portfolio. Pursuant to California law (see Ins. Code, § 1011), the Commissioner seized ELIC’s assets on April 11, 1991, by order of the superior court and put ELIC into conservatorship.
 

 The Commissioner adopted and implemented a two-part plan to rehabilitate ELIC. First, defendant Altus Finance, S.A. (Altus), a French company,
 
 *1290
 
 purchased the company’s junk bond portfolio. Second, other French investors, the MAAF Group, formed a holding company, New California Life Holdings (NCLH), that in turn purchased ELIC’s insurance business and named the new company Aurora National Life Assurance Company (Aurora). The MAAF Group owned two-thirds of NCLH.
 

 According to the Attorney General, the corporation behind these transactions was Credit Lyonnais, a French bank owned in part by the government of France, operating through its subsidiary, Altus. Credit Lyonnais and affiliated companies are among the defendants here, along with American investment bankers (hereinafter Apollo) and other purported coconspirators that acted as fronts for Altus. The complaint alleges that “[t]he Commissioner did not know that the MAAF Group was controlled by Altus or that Apollo would share in the profits generated by the Insurance Business or the Bonds. California law required disclosure of such an interest.” Moreover, Apollo and Altus/Crédit Lyonnais knew they could not meet the announced bidding requirements because neither had any experience operating an insurance business, and state and federal law prohibited Altus from owning or operating the insurance business anyway. Apollo also knew that the Commissioner would not approve of Apollo acquiring any financial interest in the insurance business because of its bad public image as a result of its extensive connections with Drexel Burnham Lambert and Michael Milken.
 

 The Attorney General alleges that Altus fraudulently acquired ELIC’s insurance company assets from the Commissioner, in violation of state insurance and federal banking law. Insurance Code section 699.5 precludes foreign governments, agencies, or subdivisions thereof from owning, operating, or controlling, directly or indirectly, a California insurance company. The Bank Holding Company Act, 12 United States Code section 1841 et seq., prohibits a foreign bank from owning an American insurance company.
 

 Altus and its fronts purportedly made false statements denying that Credit Lyonnais would have any equity interest in or control over the buyers. Yet after Altus secretly acquired the insurance company assets, “[ujsing a backdated and falsified agreement, Altus sold Artemis [S.A., a French company owned in part by Credit Lyonnais and Frangois Pinault] the insurance business, and Apollo orchestrated the timing of formal transfers of ownership from the phony fronts to Artemis in order to avoid public scrutiny.” The Attorney General’s complaint states that “[h]ad the true facts been disclosed, the Commissioner could not and would not have approved the Altus/NCLH bid.”
 

 Artemis subsequently obtained the Commissioner’s approval to buy shares in NCLH from the MAAF Group, using applications that did not disclose the
 
 *1291
 
 Artemis-Altus relationship. By 1995, Artemis had acquired all of the MAAF Group’s interest in NCLH and therefore controlled Aurora.
 

 After the Commissioner discovered that the purchasers of ELIC’s insurance company assets were controlled by prohibited foreign entities, he filed suit in state court on February 18, 1999, alleging fraud and seeking damages. Credit Lyonnais removed the case to federal court. The same district court judge who decided the instant case is hearing that litigation, in which most of the defendants are also defendants here.
 

 Also in February 1999, a qui tam plaintiff (RoNo LLC) filed a sealed whistleblower complaint. The Attorney General intervened in the qui tam action, which was subsequently removed by defendants to federal court based on the Foreign Sovereign Immunities Act, 28 United States Code sections 1330, 1602 et seq., and consolidated with the Commissioner’s action for discovery and pretrial purposes. In January 2002, the Attorney General filed his first amended complaint, naming the Apollo parties as additional defendants. The Attorney General asserts that the State of California was damaged in an amount in excess of $2 billion by defendants’ unlawful transactions, because the ELIC business could have been sold to other entities at a higher price and a lower cost had the truth been known, with the result that more money would have been available for ELIC’s policyholders.
 

 The present lawsuit seeks, inter alia, treble damages under the CFCA, as well as “civil penalties and an order for restitution of all monies and property obtained and disgorgement of all profits derived ... as well as injunctive relief’ under the UCL.
 

 The district court found that Insurance Code section 1037 subdivision (f), which as explained,
 
 post,
 
 grants the Commissioner, as conservator and liquidator of the insolvent insurer’s assets, exclusive authority to litigate matters in connection therewith, precludes the Attorney General from prosecuting this action. The court expressed concern that the Attorney General’s claims are “utterly dependent on the testimony of the Insurance Commissioner .... Plaintiff has failed to make a single argument (and this Court cannot conceive of one) why it is necessary or even beneficial for two entirely separate and different agencies of the Executive Branch of the State of Cahfomia to pursue virtually identical claims against substantially the same defendants.” As a matter of statutory interpretation, the district court held that “[although these respective cases have been consolidated for discovery and probably could be consolidated at trial, the continued prosecution of superfluous lawsuits causes inherent and great delay, huge additional expenses and a host of complicated conceptual and practical problems. The California Legislature surely did not intend such a result when it enacted section 1037 [subdivision] (f) of the Insurance Code.”
 

 
 *1292
 
 The Attorney General appealed, and the Ninth Circuit requested a decision from this court on the above questions.
 
 [1]
 

 II. Discussion
 

 A.
 
 Are Assets of the Insolvent Insurer “State Funds”?
 

 We answer the second question first, i.e., whether assets to which the Commissioner acquires title constitute “state funds” within the meaning of the CFCA, and specifically Government Code section 12650, subdivision (b)(1) (hereinafter Government Code, section 12650(b)(1).)
 

 The CFCA imposes liability on any person who “[k]nowingly presents or causes to be presented to an officer or employee of the state ... a false claim for payment or approval.” (Gov. Code, § 12651, subd. (a)(1).) The CFCA defines a “claim” as “any request or demand for money, property, or services made to any employee, officer, or agent of the state or of any political subdivision, or to any contractor, grantee, or other recipient, whether under contract or not, if any portion of the money, property, or services requested or demanded issued from, or was provided by, the state (hereinafter ‘state funds’)____” (Gov. Code, § 12650(b)(1).)
 

 The Attorney General argues that ELIC’s assets temporarily became “state funds” when the Commissioner exercised his authority under Insurance Code section 1011 to acquire and subsequently distribute those assets to the defendants in the ELIC conservatorship proceedings. Insurance Code section 1011 provides in pertinent part: “The superior court of the county in which the principal office of a person described in Section 1010 [i.e., insurance companies and specified other entities] is located shall, upon the filing by the commissioner of the verified application showing any of the following conditions hereinafter enumerated to exist, issue its order
 
 vesting title to all of the assets of that person, wheresoever situated, in the commissioner
 
 or his or her successor in office, in his official capacity as such, and direct the commissioner forthwith to take possession of all of its books, records, property, real and personal, and assets, and to conduct, as conservator, the business of said person, or so much thereof as to the commissioner may seem appropriate, and enjoining said person and its officers, directors, agents, servants, and employees from the transaction of its business or disposition of its property until the further order of said court: [][]... [f] (d) That such person is found, after an examination, to be in such condition that its further
 
 *1293
 
 transaction of business will be hazardous to its policyholders, or creditors, or to the public.” (Ins. Code, § 1011, italics added.)
 

 The statute is part of a statutory scheme found in chapter 1, article 14 of the Insurance Code (hereinafter article 14), relating to the Commissioner’s treatment of insolvent insurers. Article 14 is the functional equivalent of federal bankruptcy laws, which generally do not apply to insurance companies. (11 U.S.C. § 109(b)(2).) After acquiring title to the insolvent insurer’s assets, the Commissioner’s role is as “a trustee for the benefit of all creditors and other persons interested in the estate of the person against whom the proceedings are pending.” (Ins. Code, § 1057.) The Commissioner acts as “conservator or liquidator” of the assets.
 
 (Id.,
 
 § 1037.) Public policy favors rehabilitating the insurance company if possible, with liquidation as a last resort.
 
 (Id.,
 
 § 1016 [proceeding to liquidation when conservation is “futile”];
 
 Commercial Nat. Bank v. Superior Court
 
 (1993) 14 Cal.App.4th 393, 398 [17 Cal.Rptr.2d 884].) In order to effect rehabilitation, the Commissioner may enter into a court-approved rehabilitation agreement. (Ins. Code, § 1043.) The Commissioner’s conservatorship is terminated by the court at the behest of either the Commissioner or the insurer when the ground for such conservator-ship “does not exist or has been removed” and when the insurer “can properly resume title and possession of its property and the conduct of its business.”
 
 (Id.,
 
 § 1012.) If the Commissioner goes the liquidation route, his or her role terminates after executing a court-approved plan for disbursing the insurer’s assets among its creditors.
 
 (Id.,
 
 § 1035.5.)
 

 The Attorney General argues that the phrase “issued from” as it appears in Government Code, section 12650(b)(1) encompasses the transfer of property at issue in this case, i.e., property temporarily controlled by the Commissioner as a trustee on behalf of private parties. “In statutory construction cases, our fundamental task is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation]. ‘We begin by examining the statutory language, giving the words their usual and ordinary meaning.’ ”
 
 (Estate of Griswold
 
 (2001) 25 Cal.4th 904, 910-911 [108 Cal.Rptr.2d 165, 24 P.3d 1191].) The Attorney General contends that the dictionary definition of the phrase “to issue” supports his position. Specifically, the Attorney General points to Black’s Law Dictionary (5th ed. 1979) page 745, which defines the verb “to issue” as, inter alia, “[t]o send out, to send out officially ... to deliver, for use or authoritatively . . . .” The Attorney General also cites Webster’s Third New International Dictionary (1981) page 1201, which defines “to issue” as, inter alia, “1. to cause to come forth .... 3.a. to cause to appear or become available by bringing out for distribution to or sale or circulation among the public.”
 

 “ ‘[T]o seek the meaning of a statute is not simply to look up dictionary definitions and then stitch together the results. Rather, it is to
 
 *1294
 
 discern the sense of the statute, and therefore its words,
 
 in the legal and broader culture.
 
 Obviously, a statute has no meaning apart from its words. Similarly, its words have no meaning apart from the world in which they are spoken.’ ”
 
 (Hodges v. Superior Court
 
 (1999) 21 Cal.4th 109, 114 [86 Cal.Rptr.2d 884, 980 P.2d 433] [considering the term “arising out of’].) In the present case, we do not believe that the Attorney General’s proffered dictionary definitions shed light on the narrow question at issue here. The term “to issue” is generally employed as an abstract legal term that can apply to a broad range of activities—including “issuing” a search warrant or “issuing” capital stock of a company. (Black's Law Dict. (7th ed. 1999) p. 836.) Although the dictionary definitions of “to issue” cited by the Attorney General could theoretically encompass a transfer of private property held in trust by a public official, the use of the general term “issued from” does not definitively resolve whether the Legislature intended that specific meaning. Certainly, the term “issued from” has no special or connotative meaning that points inexorably to its application in the present context.
 

 Because the language of the statute does not answer the question before us, “ ‘we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, . . . and the statutory scheme of which the statute is a part.’ ”
 
 (Granberry
 
 v.
 
 Islay Investments
 
 (1995) 9 Cal.4th 738, 744 [38 Cal.Rptr.2d 650, 889 P.2d 970].) The legislative history of the CFCA indicates that the statute’s purpose was to protect the public treasury and the taxpayers. The principal drafter of the statute testified before the Assembly Committee on the Judiciary that the statute, which has a whistleblower component (see Gov. Code, § 12653), would be self-executing in that it would “deputiz[e] citizens to join the fight to protect the public treasury.” (Sen. Com. on Judiciary, Rep. on Assem. Bill No. 1441 (1987-1988 Reg. Sess.) appended testimony of David Huebner, representative of the Center for Law in the Public Interest, before Assem. Com. on Judiciary, May 6, 1987, p. 3) Moreover, “taxpayers benefit because their hard-earned dollars are no longer squandered through fraudulent practices .... [T]axpayers see their elected representatives . . . calling upon the source of the funds, the taxpayers themselves, for assistance. The only losers ... are those who . . . expect to get away with raiding the public treasury.”
 
 {Id.,
 
 p. 4.) The statute’s legislative sponsor, Assemblyman Floyd, stated in his letter urging Governor Deukmejian to sign the CFCA: “This bill lets the state recover treble damages plus penalties from contractors who try to rip off the taxpayer.” (Assemblyman R.E. Floyd, letter to Governor Deukmejian re Assem. Bill No. 1441 (1987-1988 Reg. Sess.), Sept. 15, 1987.)
 

 California courts have consistently reaffirmed that the Legislature “obviously designed [the CFCA] to prevent fraud on the public treasury,”
 
 (Southern Cal. Rapid Transit Dist. v. Superior Court
 
 (1994) 30 Cal.App.4th
 
 *1295
 
 713, 725 [36 Cal.Rptr.2d 665]
 
 (Southern Cal. Rapid Transit Dist.),
 
 and that “[t]he ultimate purpose of the [CFCA] is to protect the public fisc.”
 
 (City of Hawthorne ex rel. Wohlner v. H & C Disposal Co.
 
 (2003) 109 Cal.App.4th 1668, 1677 [1 Cal.Rptr.3d 312]; accord,
 
 Laraway
 
 v.
 
 Sutro & Co., Inc.
 
 (2002) 96 Cal.App.4th 266, 274 [116 Cal.Rptr.2d 823];
 
 City of Pomona
 
 v.
 
 Superior Court
 
 (2001) 89 Cal.App.4th 793, 801 [107 Cal.Rptr.2d 710];
 
 Levine v. Weis
 
 (1998) 68 Cal.App.4th 758, 765 [80 Cal.Rptr.2d 439].)
 

 Because the purpose of the CFCA is to protect the public treasury and the taxpayer, we next inquire into whether that purpose would be fulfilled by treating the property at issue in this case as “state funds.” Our starting point is
 
 Carpenter v. Pacific Mutual Life Ins. Co.
 
 (1937) 10 Cal.2d 307 [74 P.2d 761]
 
 (Carpenter),
 
 in which this court addressed the nature of the Commissioner’s property interest in the assets of an insolvent insurance company. In
 
 Carpenter,
 
 policyholders of an insolvent insurer subject to rehabilitation proceedings under Insurance Code section 1011 challenged a court order affirming the rehabilitation plan, arguing that the Commissioner improperly used the insolvent insurer’s assets to purchase stock in a new insurance company.
 
 (Carpenter, supra,
 
 10 Cal.2d at p. 339.) The policyholders asserted that in using the assets to purchase stock of another company, the “commissioner as conservator” violated a California constitutional provision (Cal. Const., former art. XII, § 13, now art. XVI, § 17), prohibiting the state from loaning its credit to, subscribing to, or otherwise being interested in the stock of a corporation.
 

 This court acknowledged that Insurance Code section 1011 “vest[s] the commissioner with title to all the assets of the [insolvent insurance] company.”
 
 (Carpenter, supra,
 
 10 Cal.2d at p. 330.) It also recognized that the Commissioner is a “state officer” and that the “state has an interest in rehabilitating insolvent insurance companies.”
 
 (Id.
 
 at p. 340.)
 
 Carpenter
 
 nonetheless rejected the argument that the Commissioner’s temporary control over the property rendered the state “interested” in the stock of the new insurer. “Of course the insurance commissioner is a state officer, and of course the state has an interest in rehabilitating insolvent insurance companies, but that interest is not a vested interest as is contemplated by the above constitutional provision. Section 1057 of the Insurance Code . . . expressly provides that in all proceedings thereunder the commissioner acts as trustee for the benefit of all of the creditors of the insolvent company. It is quite clear that the commissioner by subscribing to the stock of the new company has not loaned the credit of the state to the new company.
 
 Not a penny of state money has gone into the treasury of the new company
 
 .... The commissioner acting pursuant to statute, with court approval, took certain assets of the old company and transferred them to the new company in exchange for the stock which he holds as trustee for the benefit of the creditors of the old
 
 *1296
 
 company. Obviously, the commissioner as a state officer did not subscribe to the stock of the new company so as to make the state a stockholder.” (Ibid., italics added.)
 

 Thus, both
 
 Carpenter
 
 and the Insurance Code provisions cited,
 
 ante,
 
 demonstrate that the assets to which the Commissioner holds title do not become part of the public treasury, but are held in trust for the benefit of private parties. This point is underscored by what the Commissioner actually did with the proceeds of the sale of ELIC’s assets in the present case. As recounted by the district court in this case, these proceeds were not transferred to the state’s General Fund, but rather were initially invested in an escrow account established by the Commissioner, and were ultimately conveyed to private corporations.
 
 (State of California ex rel. RoNo, LLC,
 
 (C.D.Cal. 2002) No. CV01-8587AHM (CWX), 2002 WL 1008251 at *9; see also
 
 In re Executive Life Ins. Co.
 
 (1995) 32 Cal.App.4th 344, 360-361 [38 Cal.Rptr.2d 453].) At no time did these funds in any sense become public funds.
 

 The Attorney General’s argument that the assets are state funds is further undermined by language elsewhere in the CFCA, particularly Government Code section 12651, subdivision (a). That subdivision states that the penalty for a violation of the CFCA is “three times the amount of damages which the state . . . sustains.” In the present case, in which the state holds property in trust for private beneficiaries, the state has sustained no damages. The Attorney General contends that absent defendants’ allegedly fraudulent bid for ELIC’s assets, another bidder would have paid more money for the property. But the Attorney General does not dispute that any additional money paid for ELIC’s assets by an alternate bidder would have ultimately been distributed to policyholders and other creditors of ELIC rather than deposited into the state treasury. (See Ins. Code, § 1033.) Indeed, the state has disclaimed any liability under the rehabilitation plan, which states that “the parties hereto agree and acknowledge that the State of California is not a party and shall have no liability with respect hereto.”
 
 [2]
 

 The Attorney General cites
 
 Southern Cal. Rapid Transit Dist., supra,
 
 30 Cal.App.4th 713, for the proposition that a false claim under the CFCA does not require financial harm to the public treasury. In that
 
 *1297
 
 case, the court held that the defendants’ false documentation regarding their status as a disadvantaged business enterprise fell within the scope of the CFCA. The distinction between that case and the present one is fundamental. In
 
 Southern Cal. Rapid Transit Dist.,
 
 the defendants’ fraudulent documentation was in connection with a bid that would have led a governmental entity to provide funds from the public treasury under false pretenses. In other words, it was an
 
 attempt
 
 to defraud the government out of public funds. In the present case, no such public funds are at issue. In fact,
 
 Southern Cal. Rapid Transit Dist.
 
 stated that “As a statute obviously designed to
 
 prevent fraud on the public treasury,
 
 [Government Code] section 12653 plainly should be given the broadest possible construction consistent with that purpose.”
 
 (Southern Cal. Rapid Transit Dist., supra,
 
 30 Cal.App.4th at p. 725, italics added.) Although the CFCA authorizes civil penalties for attempts to misappropriate public funds that were not in fact completed by payment from the treasury (see Gov. Code, § 12651, subd. (a)(1) [anyone who “[k]nowingly presents or causes to be presented ... a false claim for payment or approval” may be liable under the CFCA]), we are aware of no successful CFCA case that did not involve either potential or actual harm to the public treasury.
 
 [3]
 

 Moreover, the CFCA “is patterned on similar federal legislation” and it is appropriate to look to precedent construing the equivalent federal act.
 
 (Laraway v. Sutro & Co., Inc., supra,
 
 96 Cal.App.4th at pp. 274—275.) Federal authority construing the FFCA supports our construction of the CFCA. In
 
 Hutchins
 
 v.
 
 Wilentz, Goldman & Spitzer
 
 (3d Cir. 2001) 253 F.3d 176
 
 (Hutchins),
 
 the court affirmed the dismissal of a claim brought under the FFCA based on fraudulently inflated legal bills submitted to the United States Trustee
 
 [4]
 
 and United States Bankruptcy Court in various bankruptcy proceedings. Although the fraudulently procured check in
 
 Hutchins
 
 was signed by a
 
 *1298
 
 “government agent,” payment came not from the United States government but from the assets of those in bankruptcy. Like the CFCA, the FFCA defines “claim” to include requests for property “if the United States Government provides any portion of the . . . property.” (31 U.S.C. 3729(c).)
 

 The
 
 Hutchins
 
 court held there was no false claim under the FFCA. The court first reviewed the legislative history behind the statute. “The False Claims Act was originally adopted following a series of sensational congressional investigations into the sale of provisions and munitions to the War Department. Testimony before Congress painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war. Congress wanted to stop this plundering of the public treasury. At the same time it is equally clear that the False Claims Act was not designed to reach every kind of fraud practiced on the Government.”
 
 (Hutchins, supra,
 
 253 F.3d at p. 183.)
 

 The
 
 Hutchins
 
 court then concluded that the bills submitted to the bankruptcy court and United States Trustee were not within the scope of the FFCA because “the submission of false claims to the United States government for approval which do not or would not cause financial loss to the government are not within the purview of the False Claims Act.”
 
 (Hutchins, supra,
 
 253 F.3d at p. 184.) “[T]he purpose of the [FFCA] ‘was to provide for restitution to the government of [any] money taken from it by fraud.’ [Citation.] It was not intended to impose liability for every false statement made to the government. . . .”
 
 {Ibid)
 
 “Extending the [FFCA] to reach any false statement made to the government, regardless of any impact on the United States Treasury, would appear to impermissibly expand standing doctrine and essentially permit any [qui tarn] plaintiff to sue on behalf of the government when false or misleading statements are made to any government agent including the courts, the legislature or any law enforcement officer.”
 
 (Id.
 
 at p. 184, fn. 5.)
 

 The Attorney General contends
 
 Hutchins
 
 is distinguishable because in that case the United States Trustee may not have been acting as a bankruptcy trustee, analogous to the conservatorship role played by the Commissioner in this case, but merely as an administrator overseeing bankruptcy proceedings. Yet whether the United States Trustee was serving as a trustee or merely supervising trastees, the significant similarity remains: false claims were made to assets that never became public funds, and therefore those claims had no potential or actual impact on the public treasury.
 
 [5]
 

 
 *1299
 
 The Attorney General argues that the Commissioner, in discharging his duties under article 14, is primarily acting not as a trustee of private funds but as a public officer. He cites Insurance Code section 1059, which provides that in the performance of any of his duties under article 14, the Commissioner “shall be deemed to be a public officer acting in his official capacity on behalf of the State.” (Ins. Code, § 1059.) In that connection he also cites
 
 Mitchell
 
 v.
 
 Taylor
 
 (1935) 3 Cal.2d 217 [43 P.2d 803]. In
 
 Mitchell,
 
 the Commissioner was appointed liquidator of an insolvent insurance company and on appeal from an adverse ruling, sought to avoid a statutory filing fee. The
 
 Mitchell
 
 court found that the Commissioner was acting in his official capacity on behalf of the state, and thus was exempt from the fee under former Political Code section 4295, which stated that “ ‘the state ... or any public officer . . . acting in his . . . official capacity on behalf of the state . . . shall not be required to pay or deposit any fee for the filing of any document or paper, or for the performance of any official service ....’” (Mitchell, at p. 218.) In arriving at this conclusion, the
 
 Mitchell
 
 court reasoned that the “state has an interest” in
 
 *1300
 
 the liquidation of insolvent insurance companies and that the Insolvency Act has “made provision for a state officer to protect and advance that interest.”
 
 (Id.
 
 at p. 219.)
 

 There is no question that when the Commissioner acts to rehabilitate an insolvent insurer, he does so as a public officer and furthers a public interest. But it is equally clear that, when he performs that particular public office, he also serves as a conservator and trustee on behalf of private policyholders and creditors. “The Commissioner is an officer of the state [citation] who, when he or she is a conservator, exercises the state’s police power to carry forward the public interest and to protect policyholders and creditors of the insolvent insurer.”
 
 (In re Executive Life Ins. Co., supra,
 
 32 Cal.App.4th at p. 356.) The Commissioner’s role as a public officer is wholly consistent with his role as a trustee under article 14. Nothing in
 
 Mitchell
 
 suggests that, because the .Commissioner acts as a public officer under article 14, he or she transforms': tjhe assets acquired pursuant to Insurance Code section 1011 into public funds.
 

 In sum, we conclude that the “state funds” necessary to state a claim under the CFCA only include funds that are in some sense part of the public treasury, the diminution of which harms or would harm taxpayers. When the Commissioner takes title to the assets of an insolvent insurer pursuant to Insurance Code section 1011, he holds them as a trustee for the benefit of private parties, and they never become part of the public treasury. Because the Attorney General alleges that defendants falsely procured private, rather than public, funds, he may not allege a claim under the CFCA.
 

 Our holding that such fraud is not within the scope of the CFCA obviously does not mean that those perpetuating the fraud may escape liability. As the record makes clear, the Commissioner, as trustee of the insolvent insurance company, has sought both substantial compensatory and punitive damages against at least some of the defendants in this action for their alleged fraud and misconduct. All that we hold is that the specific remedies under the CFCA are available not for
 
 any
 
 fraud against the government but rather one which leads to potential or actual injury to the public treasury and the taxpayer. No such injury is present when false claims involve the insolvent insurers’ assets that the Commissioner holds in trust for private parties.
 

 B.
 
 The Attorney General’s Standing to Pursue His Claims in Light of Insurance Code Section 1037, Subdivision (f).
 

 We turn now to the first question, that is, can the Attorney General pursue civil remedies, under the CFCA and the UCL, concerning the assets of an insolvent insurance company for which the Commissioner is acting as
 
 *1301
 
 conservator or liquidator, or does the Insurance Code, particularly section 1037, subdivision (f), give exclusive authority to the Commissioner to bring civil actions?
 

 As discussed in the first part of this opinion, the assets to which the Commissioner acquires title from an insolvent insurance company under Insurance Code section 1101 are not “state funds” within the meaning of the CFCA. Therefore, the Attorney General has no standing to pursue a CFCA claim that pertains to those assets.
 

 As for the UCL claim, as explained,
 
 post,
 
 we conclude the answer varies depending upon the remedy sought. Accordingly, each remedy the Attorney General seeks under the UCL—restitution, civil penalties, and injunctive relief—will be discussed in turn.
 

 1.
 
 Restitution
 

 “Through the UCL a plaintiff may obtain restitution and/or injunctive relief against unfair or unlawful practices in order to protect the public and restore to the parties in interest money or property taken by means of unfair competition.”
 
 (Kraus v. Trinity Management Services, Inc.
 
 (2000) 23 Cal.4th 116, 126 [96 Cal.Rptr.2d 485, 999 P.2d 718]
 
 (Kraus);
 
 see Bus. & Prof. Code, § 17204.) A UCL action may be prosecuted by the Attorney General, by certain specified local law enforcement officials, “or by any person who has suffered injury in fact and has lost money or property as a result of such unfair competition.” (Bus. & Prof. Code, § 17204.)
 

 Business and Professions Code section 17205 provides: “Unless otherwise expressly provided, the remedies or penalties provided by [the UCL] are cumulative to each other and to the remedies or penalties available under all other laws of this state.” Therefore, the fact that there are alternative remedies under a specific statute does not preclude a UCL remedy, unless the statute itself provides that the remedy is to be exclusive. (See
 
 Stop Youth Addiction, Inc. v. Lucky Stores, Inc.
 
 (1998) 17 Cal.4th 553, 573 [71 Cal.Rptr.2d 731, 950 P.2d 1086]
 
 (Stop Youth Addiction).)
 
 We conclude that Insurance Code section 1037, subdivision (f) is such an express limit on the authority of the Attorney General to seek a restitutionary remedy under the UCL.
 
 [6]
 

 As discussed in the previous part of this opinion, Insurance Code section 1057 defines the Commissioner’s basic role in insolvent insurance company
 
 *1302
 
 proceedings: “In all proceedings under this article, the commissioner shall be deemed to be a trustee for the benefit of all creditors and other persons interested in the estate of the person against whom the proceedings are pending.” Insurance Code section 1037 further defines the Commissioner’s role when he takes possession of the property of the insolvent company. It provides in pertinent part: “Upon taking possession of the property and business of any person in any proceeding under this article, the commissioner,
 
 exclusively and except as otherwise expressly provided by this article,
 
 either as
 
 conservator or liquidator.
 
 [][]... [f] (f) May, for the purpose of executing and performing any of the powers and authority conferred upon the commissioner under this article, in the name of the person affected by the proceeding or in the commissioner’s own name,
 
 prosecute and defend any and all suits and other legal proceedings,
 
 and execute, acknowledge and deliver any and all deeds, assignments, releases and other instruments necessary and proper to effectuate any sale of any real and personal property . . . .” (Italics added.)
 

 The purpose of article 14 is, like federal bankruptcy law, to ensure the equitable distribution of an insolvent debtor’s property among creditors, but it also has “the additional and more urgent purpose of protecting an insurance company’s policyholders, as well as its creditors, by preventing dissipation of the company’s assets when it is found by the Commissioner to be in a hazardous condition.”
 
 (Garamendi v. Executive Life Ins. Co.
 
 (1993) 17 Cal.App.4th 504, 519 [21 Cal.Rptr.2d 578].) Insurance Code section 1037, subdivision (f) recognizes that the Commissioner as trustee has the exclusive right to protect the interests of policyholders and other creditors. The statute is therefore in accord with the law of trusts, which generally gives the trustee, rather than the beneficiaries of the trust, the right to sue on behalf of the trust. (See
 
 City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith
 
 (1998) 68 Cal.App.4th 445, 461—462 [80 Cal.Rptr.2d 329]; see also 4 Scott on Trusts (4th ed. 1989) § 282, pp. 26-28.) The Attorney General recognizes that the purpose of article 14 is to preclude “common-law derivative actions by interested persons which are historically barred under trust laws.”
 

 A UCL claim for restitution seeks to compel “defendants] to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person.”
 
 (Kraus, supra,
 
 23 Cal.4th at pp. 126-127, fn. omitted.) The Attorney General affirms that the restitutionary remedy “will inure to the benefit of ELIC’s creditors.”
 
 [7]
 

 
 *1303
 
 There can be little doubt that if, for example, a policyholder attempted a common law action seeking restitution as a remedy to restore property lost by an insolvent insurance company, such an action would be precluded by Insurance Code section 1037, subdivision (f). The suit would fall squarely within the exclusive role of the Commissioner, as conservator and trustee, to “prosecute and defend any and all suits and other legal proceedings” pertaining to the insolvent insurer’s property and business.
 
 (Ibid.)
 
 There can also be little doubt that a policyholder’s suit seeking such a restitutionary remedy on behalf of the insolvent company would be precluded by section 1037, subdivision (f), regardless of whether the claim for restitution was brought under the UCL or under a common law theory. In either case, the claim, in substance, would usurp the Commissioner’s exclusive role as conservator and trustee under article 14 generally and section 1037, subdivision (f) specifically.
 

 It is difficult to see how the situation would be different if it were the Attorney General, rather than a policyholder, bringing a UCL action for restitution. It is true that the Attorney General is the state’s chief law enforcement officer, and that restitution may have a collateral law enforcement effect, punishing the wrongdoer against whom restitution is sought. But the primary purpose of the Attorney General’s attempt at restitution is to recover lost property on behalf of an insolvent insurer’s creditors and policyholders. As such, he seeks to perform an action that is quintessentially within the scope of the Commissioner’s power as conservator and trustee of the insolvent company. Because Insurance Code section 1037, subdivision (f) assigns the role of pursuing such restitutionary remedies on behalf of creditors and policyholders of the insolvent company exclusively to the Commissioner, we conclude that the Attorney General may not pursue that remedy.* ******
 
 [8]
 

 
 *1304
 
 The Attorney General cites
 
 People
 
 v.
 
 Pacific Land Research Co.
 
 (1977) 20 Cal.3d 10 [141 Cal.Rptr. 20, 569 P.2d 125]
 
 (Pacific Land Research Co.)
 
 in support of his position. In that case the Attorney General sought civil penalties, injunctive relief, and restitution pursuant to Business and Professions Code section 17535
 
 [9]
 
 against a company alleged to have made the misrepresentations in connection with the sale of land. This court rejected the defendant’s contention that the Attorney General’s action for restitution was in substance a class action lawsuit that was required to comply with the same procedural safeguards as private class action suits.
 
 (Pacific Land Research Co., supra, 20
 
 Cal.3d at p. 16.) As we stated, in distinguishing the Attorney General’s action from a private class action suit: “An action filed by the People seeking injunctive relief and civil penalties is fundamentally a law enforcement action designed to protect the public and not to benefit private parties. The purpose of injunctive relief is to prevent continued violations of the law and to prevent violators from dissipating funds illegally obtained. Civil penalties, which are paid to the government [citations], are designed to penalize a defendant for past illegal conduct. The request for restitution on behalf of vendees in such an action is only ancillary to the primary remedies sought for the benefit of the public. [Citation.] While restitution would benefit the vendees by the return of the money illegally obtained, such repayment is not the primary object of the suit, as it is in most private class actions.”
 
 (Id.
 
 at p. 17.)
 

 While the above is true, it is not significant in the present context. Although the action by the Attorney General for restitution may be ancillary to the “primary remedies” tied directly to law enforcement actions, the Attorney General cannot, when the Commissioner acts as conservator of an insolvent insurance company, pursue such remedies without trespassing on the Commissioner’s role.
 

 The Attorney General also cites cases holding that the UCL endowed the Attorney General and the Commissioner with concurrent jurisdiction over violations of the Insurance Code. In
 
 Farmers Ins. Exchange
 
 v.
 
 Superior Court
 
 (1992) 2 Cal.4th 377 [6 Cal.Rptr.2d 487, 826 P.2d 730], for example, we concluded that a statutory scheme that permitted those improperly denied a good drivers discount to pursue an administrative remedy with the Commissioner (see Ins. Code, §§ 1858, 1861.02 and 1861.05) did not preclude the Attorney General’s UCL action, although we held the Commissioner had primary jurisdiction over the complaint.
 
 (Farmers Ins. Exchange, supra, 2
 
 Cal.4th at pp. 394-395, 398-399.) But in that and other cases cited by the Attorney General, the Commissioner acted as a regulator,
 
 *1305
 
 and there was nothing in the regulatory scheme to suggest an exception to the rule that UCL remedies are “cumulative ... to remedies and penalties available under all other laws of this state.”
 
 (Id.
 
 at p. 395; see also
 
 People ex rel. Orloff v. Pacific Bell
 
 (2003) 31 Cal.4th 1132, 1155 [7 Cal.Rptr.3d 315, 80 P.3d 201] [district attorney may pursue UCL action against public utility for misleading representations despite the Public Utility Commission’s concurrent jurisdiction].) In the present case, the Commissioner is acting primarily not as regulator but as conservator and trustee, and is given, as discussed, the exclusive authority to act on behalf of the insolvent insurer’s policyholders and creditors in civil actions. This exclusive authority precludes the Attorney General from exercising concurrent jurisdiction in a manner that would essentially duplicate the Commissioner’s legal action. The Attorney General’s claim for restitution under the UCL does precisely that and is therefore barred by Insurance Code section 1037, subdivision (f).
 

 2.
 
 Civil Penalties
 

 The Attorney General’s claim for civil penalties under the UCL is a different matter. Civil penalties are authorized by Business and Professions Code section 17206, which provides in pertinent part: “(a) Any person who engages, has engaged, or proposes to engage in unfair competition shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General,” and by district attorneys, city attorneys and county counsel under specified circumstances. Thus, unlike Business and Professions Code section 17204, which authorizes that the injunctive and restitutionary remedies provided in the UCL may be pursued by “any person who has suffered injury in fact,” section 17206 limits the acquisition of civil penalties to the Attorney General and other specified government officials.
 

 Further, Business and Professions Code section 17206, subdivision (c) provides: “If the action is brought by the Attorney General, one-half of the penalty collected shall be paid to the treasurer of the county in which the judgment was entered, and one-half to the [State] General Fund. If the action is brought by a district attorney or county counsel, the penalty collected shall be paid to the treasurer of the county in which the judgment was entered.” The recent amendment of section 17206 by Proposition 64 further provides that the penalty funds “shall be for the exclusive use by the Attorney General [and other public officials] for the enforcement of consumer protection laws.” (Bus. & Prof. Code, § 17206, subd. (c), as amended by Prop. 64, as approved by voters, Gen. Elec. Nov. 2, 2004.)
 

 
 *1306
 
 In the present case, defendants are alleged to have violated several laws, including California Insurance Code section 699.5, precluding foreign governments from owning or controlling a California insurance company, and the Bank Holding Company Act, 12 United States Code section 1841 et seq., prohibiting a foreign bank from owning an American insurance company. Defendants concede Insurance Code section 1037, subdivision (f) does not preclude the Attorney General from bringing a criminal action against them. We fail to discern a difference, for present purposes, between the Attorney General’s seeking criminal penalties or civil penalties. “Civil penalties, which are paid to the government [citations] are designed to penalize a defendant for past illegal conduct.”
 
 (Pacific Land Research Co., supra,
 
 20 Cal.3d at p. 17.) Such penalties are not primarily concerned with restoring policyholders’ or creditors’ property. Thus the public, penal objective of civil penalties under the UCL differs fundamentally from the Commissioner’s purpose under article 14 of protecting the beneficiaries of the insolvent insurance company. We conclude that nothing in article 14 precludes the Attorney General from suing for civil penalties under the UCL.
 

 3.
 
 Injunctive Relief
 

 We employ the same analysis when it comes to injunctive relief. As we have recognized, injunctive relief may fall into two categories: injunctions intended “to remedy a public wrong”
 
 (Broughton v. Cigna Healthplans
 
 (1999) 21 Cal.4th 1066, 1080 [90 Cal.Rptr.2d 334, 988 P.2d 67]) and injunctions primarily intended to resolve “a conflict between the parties and rectify [] individual wrongs”
 
 (id.,
 
 at p. 1080, fin. 5). Injunctions sought under the UCL may fall into either category. (See
 
 Cruz v. PacifiCare Health Systems, Inc.
 
 (2003) 30 Cal.4th 303, 315 [133 Cal.Rptr.2d 58, 66 P.3d 1157].)
 

 In line with the above discussion, we hold that when the Attorney General seeks an injunction that will protect the public and prevent defendants from committing future unlawful acts, he is fulfilling primarily a law enforcement function. Such a claim is therefore not prohibited by Insurance Code section 1037, subdivision (f). If however, he seeks an injunction designed to resolve a conflict or in some way change the relationship between defendants and policyholders, creditors or others represented by the Commissioner as conservator and trustee of the insolvent insurance company, that injunction would be precluded by Insurance Code section 1037 subdivision (f). It is unclear from the record before us into which category the Attorney General’s requested injunctive relief falls.
 

 
 *1307
 
 III. Conclusion
 

 We conclude that assets held in trust by the Insurance Commissioner pursuant to Insurance Code section 1011 are not state funds within the meaning of the CFCA, and that the Attorney General has standing only to pursue civil penalties and possibly injunctive relief under the UCL.
 

 George, C. J., Kennard, J., Baxter, J., Yegan, J.,
 
 *
 
 and Zelon, J.,
 
 †
 
 " concurred.
 

 [1]
 

 Since accepting the Ninth Circuit’s request, we have been informed by the Attorney General that he has entered into a settlement with some but not all of the defendants, apparently in conjunction with a settlement between these defendants and the Commissioner. The defendants include Credit Lyonnais, Aurora, and NLCH.
 

 [2]
 

 The Attorney General also argues that one category of damages that the state can recover is the cost of the rehabilitation proceeding, as well as the cost of the subsequent governmental investigation in this case, citing
 
 United States v. Halper
 
 (1989) 490 U.S. 435, 445 [104 L.Ed.2d 487, 109 S.Ct. 1892]. But
 
 Halper
 
 merely held that investigation costs could be included as one category of damages under the federal False Claims Act (FFCA, 31 U.S.C. § 3729 et seq.).
 
 (Halper, supra,
 
 490 U.S. at p. 445.) It did not hold that investigation costs of a claim that is outside the purview of that statute are reimbursable under the statute, or that investigation costs transmute a common law fraud claim into an FFCA claim.
 

 [3]
 

 The Attorney General cites various cases which purportedly stand for the proposition that “federal courts find cognizable a claim under the [FFCA] if the false claim impairs the government’s achievement of public goals and objectives, irrespective of financial harm to the treasury.” However, the cited cases do not prove the Attorney General’s proposition, nor do they contradict our conclusion that the underlying purpose of the FFCA is to deter fraud on public funds. (See
 
 Rex Trailer Co.
 
 v.
 
 United States
 
 (1956) 350 U.S. 148, 150 [100 L.Ed. 149, 76 S.Ct. 219] [action for recovery under the Surplus Property Act predicated upon false statements made in obtaining government property];
 
 U.S. v. Mackby
 
 (9th Cir. 2003) 339 F.3d 1013, 1018 [action under the FFCA involving fraudulent demands for Medicare reimbursement];
 
 Bly-Magee v. California
 
 (9th Cir. 2001) 236 F.3d 1014, 1017 [qui tarn action under the FFCA seeking to recover allegedly misappropriated federal funds made available to the State of California for vocational rehabilitation services].) Although the above cases state that financial loss is not a prerequisite to recovery under the FFCA, they clearly involve claims for public, rather than private funds.
 

 [4]
 

 The United States Trustee, who is appointed in each of 21 regions, assumes various administrative responsibilities in bankruptcy cases, including supervising bankruptcy trustees and serving as trustee in certain cases. (1 Cowan, Bankruptcy Law & Practice (7th ed. 1998) § 2.09, pp. 174-175.)
 

 [5]
 

 The Attorney General cites
 
 Hayes v. CMC Electronics, Inc.
 
 (2003) 297 F.Supp.2d 734
 
 (Hayes),
 
 in support of its position and to illustrate the limits of
 
 Hutchins.
 
 In
 
 Hayes,
 
 the United States contracted with AEG Electronics (AEG) for the purchase of defense equipment, and
 
 *1299
 
 AEG in turn contracted with the Canadian Marconi Corporation (CMC) to fill the necessary order. The United States then resold the equipment to Saudi Arabia under an agreement authorized by the Arms Export Control Act, 22 United States Code section 2751 et seq. (See 22 U.S.C. § 2762, under which the President may sell defense articles and services to eligible foreign entities.) The United States intervened in a qui tarn action brought against CMC under the FFCA, alleging that CMC submitted fraudulently inflated invoices for the defense equipment to the United States. The district court upheld the FFCA action against the defendant’s motion to dismiss.
 

 The Attorney General, citing 22 United States Code section 2762(a), argues that in
 
 Hayes
 
 “[n]o government funds were involved, since Saudi Arabia was required to protect the federal government against any risk of loss and to advance the money used to purchase the radios.” But the
 
 Hayes
 
 court identified several tangible potential harms to the United States Treasury from the alleged false claim: “First, the Government paid more money than it otherwise would have paid if CMCE had disclosed that the radios contained used parts. . . . Second, the U.S. government is likely to be required to reimburse the Saudi government for the loss sustained by the Saudi government. Third, the Government suffered damage to the integrity of the contracting process as Saudi Arabia received used radio sets despite paying for new ones. Finally, it is possible that Saudi Arabia will have less money to spend on other defense needs, thereby forcing the U.S. to increase its expenditures by a like amount to obtain the same level of global security. [][] Even if the false claim had thus far resulted in only the potential for loss to the U.S. Government, this would be sufficient for a cause of action under the [F]FCA.”
 
 (Hayes, supra,
 
 297 F.Supp.2d at pp. 737-738.)
 

 Hayes
 
 explicitly distinguished
 
 Hutchins.
 
 “The Third Circuit [in Hutchins] recognized that ‘the False Claims Act seeks to redress fraudulent activity which attempts to or actually causes economic loss to the United States Government.’ [Citation.] . . . CMCE’s claim was made for funds in the United States Treasury. Thus, CMCE’s alleged fraudulent or false statements are within the category contemplated in
 
 Hutchins
 
 as actionable under the [F]FCA.”
 
 (Hayes, supra,
 
 297 F.Supp.2d at pp. 738-739, fns. and boldface omitted.) The present case, as discussed,
 
 ante,
 
 resembles
 
 Hutchins
 
 rather than
 
 Hayes,
 
 involving funds that were not part of the public treasury and a fraud that did no damage to the public fisc.
 

 [6]
 

 We have left open the question whether Business and Professions Code section 17205 precludes the Legislature from impliedly repealing a UCL remedy if the two are “ 1 “ ‘clearly repugnant, and so inconsistent that the two cannot have concurrent operation.’ ” ’ ”
 
 (Stop Youth Addiction, supra,
 
 17 Cal.4th at p. 574.) Because we decide the limit on UCL remedies is express in the present case, we need not decide that question.
 

 [7]
 

 The Attorney General refers in his complaint to “restitution/disgorgement” remedies. As we explained, “[a]n order that a defendant disgorge money obtained through an unfair business practice may include a restitutionary element, but is not so limited. . . . [S]uch orders may
 
 *1303
 
 compel a defendant to surrender all money obtained through an unfair business practice of all unlawfully obtained profits even though not all is to be restored to the person from whom it was obtained or those claiming under those persons.”
 
 (Kraus, supra,
 
 23 Cal.4th at p. 127.) In this case, although the Attorney General refers to a disgorgement remedy, we understand his claim as essentially one for restitution, i.e., to return the money to the insurer’s creditors. Moreover, outside the class action context, a disgorgement remedy in the sense described,
 
 ante,
 
 is not authorized.
 
 (Id.
 
 at p. 137.)
 

 [8]
 

 The principal exception to the rule that the trustee rather than the beneficiary may prosecute lawsuits against those who harm trust property is under certain circumstances in which the trustee itself breaches its duty to the trust and third parties participate with the trustee in the breach.
 
 (City of Atascadero
 
 v.
 
 Merrill Lynch, Pierce, Fenner & Smith, Inc., supra,
 
 68 Cal.App.4th at pp. 462-467.) There is no suggestion in the present case that the Commissioner has breached his duty as trustee, and we do not consider whether the Attorney General’s UCL action for restitution would be warranted under such circumstances.
 

 [9]
 

 Business and Professions Code section 17535, which pertains to certain forms of misleading advertising, provides essentially the same remedies as the UCL under Business and Professions Code section 17203.
 

 *
 

 Associate Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
 

 †
 

 Associate Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.