Filed 3/14/16  Marriage of Shannahan

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of SARACIA and WILLIAM P. SHANNAHAN. | D067258 |
| SARACIA SHANNAHAN, | |
| Respondent, | (Super. Ct. Nos. D483710, 37-2009-00091569-CU-MC-CTL, 37-2009-00095945-CU-MC-CTL) |
| v. | |
| WILLIAM P. SHANNAHAN, | |
| Appellant; | |
| HIGGS, FLETCHER & MACK LLP, | |
| Appellant. | |

APPEALS from an order of the Superior Court of San Diego County, Robert C. Longstreth, Judge.  Affirmed.

Higgs Fletcher & Mack, John Morris and Maggie Schroedter for Appellant Higgs Fletcher & Mack, LLP.

RSR Law Group; Law Office of James Reynolds and James Reynolds, for Appellant, William P. Shannahan.

Law Office of S. Temko and Stephen Temko; Janis Law Group and Dean T. Janis; Law Office of Beatrice L. Snider and Win Heiskala, for Respondent Saracia Shannahan.

Appellant and third party claimant Higgs Fletcher & Mack, LLP (Higgs) appeals from a family court order denying its third party claim to ownership of certain insurance funds at issue in the divorce proceedings of its former client, appellant William P. Shannahan. The family court ruled the funds, which Higgs held in trust, belonged at all times to William's former spouse, respondent Saracia Shannahan; Higgs had no right to the funds in part because William's[1] purported assignment of those funds to Higgs was invalid as in violation of an automatic temporary restraining order (ATRO; Fam. Code,[2] § 2040, subd. (a)(2)) barring transfer or hypothecation of any property that remained in effect until the final division of William and Saracia's property; and Saracia had a lien over the funds that was superior to William's assignment to Higgs.

Higgs appeals from the order, and William joins in its arguments. It contends (1) the family court's determination that the funds always belonged to Saracia is internally inconsistent, which is itself grounds for reversal; (2) the court erred by making its findings without permitting a hearing before a special master on the issue in contravention of the parties' prior judgment on reserved issues and Higgs's right to due process; and (3) the court erred by ruling Saracia's interest in the insurance funds had priority over Higgs's interest. We affirm the order denying Higgs's claim of ownership

---

[1]     We refer to William and Saracia by their first names for convenience and clarity.

[2]     Statutory references are to the Family Code unless otherwise stated.

2

on grounds William's assignment and pledge of the funds to Higgs violated the ATRO, and on that basis the family court did not err by invalidating the purported transfer and Higgs's interest.

FACTUAL AND PROCEDURAL BACKGROUND

William and Saracia were involved in divorce proceedings, in connection with which they disputed the characterization and division of personal property (furniture and furnishings) destroyed in a fire. In March 2008, following trial, a privately compensated temporary judge (Hon. Thomas Ashworth III (Ret.)) entered a final statement of decision on reserved issues. In part, the court appointed a special master pursuant to Code of Civil Procedure section 639 to make recommendations to it concerning which items of furniture or furnishings were separate property, as well as an appropriate equal division of the community items. Several months later, the court ordered that any insurance proceeds relating to the personal property be deposited into an interest bearing segregated trust account of William's counsel, Higgs, for the benefit of the parties. Thereafter, Saracia sought, and the family court stated it would grant, a "judicial lien" in Saracia's favor against William's assets.

On August 29, 2008, the court entered a judgment of dissolution on reserved issues in the matter. In addition to appointing the special master with respect to the characterization and division of furniture, the court reserved jurisdiction over the disposition of the insurance proceeds.

In October 2008, the court entered its findings and order after hearing granting Saracia a judicial lien "against all assets in [William's] name . . . ." The court also

3

ordered that the parties' ATRO's would "remain in effect until a final division of all the assets under the judgment has been made."

In April 2009, William executed an assignment of his interest in $179,297 of the personal property insurance proceeds (the insurance proceeds) within the Higgs trust account. At the same time, William executed a $100,000 promissory note in Higgs's favor and a concurrent pledge agreement granting Higgs a security interest in the insurance proceeds for his timely and complete payment of the amounts owing on the note.

In June 2010, Saracia filed a notice of lien under Code of Civil Procedure section 708.410 et seq. based on the August 29, 2008 judgment.

In early 2012, the court ordered on the parties' stipulation that all of the insurance proceeds held in trust by Higgs "on behalf of [William] or any third party on his behalf, shall be held on deposit pending disbursement pursuant to court order or judgment that specifically authorizes disbursement."

In late 2012, Saracia sought a hearing to address, inter alia, the division of the insurance proceeds held in trust. She asked the court to order those proceeds be deemed William's property on condition that the funds be released to her in partial satisfaction of the $3,400,000 judgment in her favor in the matter. In a sworn declaration, Saracia acknowledged that Higgs had asserted a lien against the proceeds, but she averred any such lien had not been disclosed to her until July 2012.

4

The hearing on Saracia's request did not take place until September 2013, with William represented by different counsel.[3] The court observed that there had not been an adjudication of the characterization and division of the insurance proceeds, which was to be done by the appointed special master. Saracia proposed to concede her interest in the funds to William as long as they were applied to her judgment. Observing that the proposal made sense, the court ruled Higgs had no right to the funds held in trust; it determined that the owner of the funds "is and has always been [Saracia] to satisfy her judgment" and its determination "extinguishe[d] any rights that Higgs might have" in them.

In its findings and order after hearing, the court found given Saracia's concession of her interest in the insurance proceeds, "the funds are and have always belonged to [Saracia] to be applied to the Judgment." The court further ruled: "The claim of assignment to Higgs . . . is denied because as Trustee of the funds by prior court order, Higgs . . . has no rights to the funds and any rights it purports to have are extinguished by the claim of [Saracia], and therefore denied. Said funds are to be released to [Saracia] forthwith." Days later, Higgs released the funds to Saracia's counsel with interest, notifying counsel of its third party claim.

_____

3     In his opening brief, William states that the court began the hearing by saying, "Anything she asks for, she gets. If anybody thinks she shouldn't get it, then they can come to me and have me order that she doesn't get it. . . . [¶] . . . But I assume if she asks for something, she needs it, and it would be provided." The court's comments were not referencing Saracia, but Carolyn Brock, who was appointed to prepare the parties' qualified domestic relations order (QDRO), and who needed authorization to access William's retirement accounts.

Higgs filed a third party claim of ownership in the family court proceeding under Code of Civil Procedure sections 720.110 and 720.210. Higgs asserted it had acquired an ownership interest by virtue of William's assignment, which it maintained was perfected in April 2009, and had also acquired a lien against William's interest in the funds assertedly created and perfected by the pledge agreement William executed on the same date. Higgs asserted that its ownership interest and lien were senior to Saracia's judgment lien, which was filed in June 2010. Higgs further argued the ATRO did not preclude William's assignment of the proceeds because the assignment constituted payment of William's attorney fees and costs in the family court proceeding. Saracia opposed the claim, asserting in part that William's assignment contravened both the judicial lien and the ATRO in the dissolution action.

In October 2014, the court confirmed its prior findings and order after hearing. It made the following additional findings and orders, which the court partly handwrote:

"a. The parties agree there is no factual dispute as to the wording and intent of the judgment;

"b. William . . . never had ownership of the funds;

"c. A Judicial Lien, or if that term is inappropriate, the appropriate device to prevent any transfer, encumbrance, or restriction on the ability of the funds to be transferred in accordance with the court's [unintelligible] determination as to ownership, was placed on the funds in 2008 before the assignment to [Higgs];

"d. This Court interprets the Judicial Lien or other appropriate device as an order that the funds not be encumbered, transferred, or restricted in any way that would

6

frustrate the intent of putting the funds in escrow [trust] so that once the Court determines the disposition, that the recipient receives the funds right away without any other claims of ownership;

"e. The assignment of the funds to [Higgs] violated the clear intent of the order of Judicial Lien or other appropriate device;

"f. The assignment of the funds to [Higgs] violated the . . . ATRO's[], which remain in effect until final distribution of all assets in this case;

"g. The assignment of the funds to [Higgs] violated the clear intent of the Court's prior orders entrusting the funds to [Higgs] to hold in its client trust account pending further court order or agreement of the parties;

"h. The Court affirms its prior order that the funds are to be released to [Saracia].

"i. Counsel for Third-Party Claimant agreed on the record that based on the Court's findings Third-Party Claimant has no rights to the funds at issue."

Higgs appeals from the October 2014 order.

DISCUSSION

Higgs advances several theories as to why the court erred in its order. We need only address one: Higgs's contention that the ATRO did not prevent William from assigning or otherwise transferring his interest in the funds to Higgs. We conclude the court's finding that William's assignment and pledge agreement violated the ATRO is a sufficient ground by itself to invalidate Higgs's purported interest and affirm the court's order. The matter is one of statutory construction that we review de novo. (*Coker v. JPMorgan Chase Bank, N.A.* (2016) 62 Cal.4th 667, 674.) " 'As always, we start with the

7

language of the statue, "giv[ing] the words their usual and ordinary meaning [citation], while construing them in light of the statute as a whole and the statute's purpose." ' " (*Ibid*.)

In every dissolution proceeding, four standard mutual ATRO's bind the petitioner (on filing the petition and issuance of summons) and the respondent (on personal service or waiver of service of the petition and summons). (§§ 233, subd. (a), 2040, subd. (a); see *In re Marriage of McTiernan & Dubrow* (2005) 133 Cal.App.4th 1090, 1102.) The ATRO's bar both parties from, among other things, "transferring, encumbering, hypothecating, concealing, or in any way disposing of any property, real or personal, whether community, quasi-community, or separate, without the written consent of the other party or an order of the court, except in the usual course of business or for the necessities of life . . . ." (§ 2040, subd. (a)(2).)

Section 2040, subdivision (a)(2) further provides: "Notwithstanding the foregoing, nothing in the restraining order shall preclude a party from using community property, quasi-community property, or the party's own separate property to pay reasonable attorney's fees and costs in order to retain legal counsel in the proceeding. A party who uses community property or quasi-community property to pay his or her attorney's retainer for fees and costs under this provision shall account to the community for the use of the property. A party who uses other property that is subsequently determined to be the separate property of the other party to pay his or her attorney's retainer for fees and costs under this provision shall account to the other party for the use of the property." This provision creates an exception to the ATRO's, permitting a party's

8

use of community, quasi-community, or separate property to pay attorney fees and costs for retaining legal counsel in their dissolution proceeding.

There is no dispute that the ATRO's issued in this case, or that the family court had ordered the ATRO's to remain effective "until a final division of all the assets under the judgment has been made." Rather, pointing to the foregoing exception permitting a party to use community property to "pay reasonable attorney's fees and costs in order to retain legal counsel in the proceeding" (§ 2040, subd. (a)(2)), Higgs's sole argument regarding these orders is that William's assignment constituted payment of his attorney fees and costs incurred in the divorce proceeding and it was "therefore . . . valid and *not precluded by the ATROs."*[4] In its reply brief, Higgs expands on this argument, pointing out there is no case authority directly on point, but maintaining "[a]s a matter of logic, the exception must apply to the payment of ongoing attorneys' fees and costs to *keep counsel retained* during the pendency of dissolution. First, attorneys' fees and costs do not arise before litigation commences—i.e., when the client would normally be expected to pay the initial retainer. Further, Saracia's argument results in an illogical and impractical result: a client in a dissolution proceeding being unable to pay his counsel after payment

---

4      Other than this exception, Higgs does not present any other theory as to why William's conduct in executing the pledge agreement or assignment falls outside section 2040. Indeed, the restraining order imposed by the statute prevents a party from "hypothecating . . . or in any way disposing of" property without the other party's written consent or court order. To "hypothecate" is to "pledge (property) as security or collateral for a debt, without delivery of title or possession." (Black's Law Dict. (10th ed. 2014) p. 861, col. 1.) Nor does Higgs argue William's actions fell within the exception for the disposal of property in the "usual course of business or for the necessities of life." (§ 2040, subd. (a)(2); see *Gale v. Superior Court* (2004) 122 Cal.App.4th 1388, 1392.)

9

of the initial retainer." Higgs further argues, citing a family law treatise, that its interpretation "comports with the commonplace practice in dissolution cases where 'attorneys routinely contract for a lien against the client's separate property and community property share awarded by the court or received in settlement.' " It maintains William's action in giving it a lien against his potential separate property (as opposed to a present interest in his property) is standard practice in dissolution cases.

On our independent review, we do not read the statute in this manner. Section 2040 does not define the phrase "in order to retain legal counsel in the proceeding" or contain any explanation of its meaning. The statute's plain meaning controls if there is no ambiguity in the statutory language. (*Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1385.) But " ' "[t]o seek the meaning of a statute is not simply to look up dictionary definitions and then stitch together the results. Rather, it is to discern the sense of the statute, and therefore its words, *in the legal and broader culture*. Obviously, a statute has no meaning apart from its words. Similarly, its words have no meaning apart from the world in which they are spoken." ' " (*State of California v. Altus Finance, S.A.* (2005) 36 Cal.4th 1284, 1296; see also *Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 19 ["[W]hen a word used in a statute has a well-established *legal* meaning, it will be given that meaning in construing the statute"].) "In interpreting a statutory provision, 'our task is to select the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the statutes' general purpose, and to avoid a construction that would lead to unreasonable, impractical, or arbitrary results.' " (*Poole*, 61 Cal.4th at p. 1385.) We read the statute " ' "with reference to the entire

10

scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." ' " (*Ibid*., quoting *Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276.)

Our analysis of section 2040 under these principles, which as we explain requires an examination of the Legislature's intent, compels us to reject William's arguments. We look first to the words and phrase used to determine what the Legislature meant for a party to use community property "to pay reasonable attorney's fees and costs in order to retain legal counsel in the proceeding." Black's Law Dictionary defines the word "retain" in various ways, including to "hold in possession or under control" or to "keep," as well as "[t]o hire; to engage for the provision of services (as by a lawyer . . .) . . . ." (Black's Law Dict., *supra*, p. 1509.) It defines the word "retainer" as "[a] client's authorization for a lawyer to act in a case," "[a] fee that a client pays to a lawyer simply to be available when the client needs legal help during a specified period or on a specified matter" and also "[a] lump-sum fee paid by the client to engage a lawyer at the outset of a matter." (*Ibid*.)[5] Though these definitions plainly include a party's initial hiring of an attorney, and the common legal understanding of a retainer is payment for the purpose of hiring, they are not limited to that interpretation. Thus, these definitions do not definitively resolve whether the Legislature intended that specific meaning.

---

[5]     The common dictionary definitions are similar. (See Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 1063 [defining "retain" as to "keep in possession or use" or "to keep in one's pay or service; *specif*: to employ by paying a retainer" and defining "retainer" as "the act of a client by which the services of a lawyer . . . are engaged" or "a fee paid to a lawyer or professional adviser for advice or services or for a claim on services when needed"].)

11

Where the statute's language is inconclusive, we turn to other extrinsic aids in interpretation, including legislative history.  (*State of California v. Altus Finance, S.A.*, *supra*, 36 Cal.4th at p. 1296 ["Because the language of the statute does not answer the question before us, ' "we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, . . . and the statutory scheme of which the statute is a part" ' "].)  Doing so reveals that the legislative history of section 2040 is dispositive on the question in Saracia's favor.

Family Code section 2040, subdivision (a) continued former Code of Civil Procedure section 412.21, which provided "for the automatic granting of restraining orders with the issuance and service of a summons in an action for dissolution or annulment of a marriage, [and] for legal separation."  (Legis. Counsel's Dig., Assem. Bill No. 1905 (1989-1990 Reg. Sess.) 4 Stats. 1989, Summary Dig., p. 415; Stats. 1994, ch. 1269, § 13.)  In 1999, the Legislature amended section 2040, subdivision (a)(2) to "cure an anomaly in current law which prevents a party in a dissolution proceeding from using his or her own separate property to pay attorney's fees and costs incurred in retaining legal counsel."  (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 357 (1999–2000 Reg. Sess.) as amended Mar. 18, 1999.)  Thus, the Legislature proposed to include a party's use of quasi-community property and separate property within the above exception for payment of reasonable attorney fees in order to retain counsel.  (Sen. Com. on Judiciary, com. on Sen. Bill No. 357 (1999-2000 Reg. Sess.) as amended Mar. 18, 1999.)  The Senate Judiciary Committee's analysis states that "the restraining order . . . is intended to preserve the community assets and to prevent waste or concealment of property that may

12

otherwise be determined to belong to the community." (*Ibid*.) However, the use of the property for the exception for payment of attorney fees is "restricted to attorney's fees and costs to retain legal counsel." (*Ibid*.) The committee analysis states, "The original intent of existing law in allowing use of community property for payment of attorney's fees is to facilitate a party's ability to retain legal counsel. Thus, *the exception is allowed only for the purpose of retaining legal counsel.* [¶] This bill would similarly allow the use of quasi-community or separate property <u>only</u> for payment of attorney's fees and costs in order to retain legal counsel. [¶] *Additional expenses for attorney's fees and costs can be taken care of by applying to the court for an order for such expenditures*." (*Ibid*., italics added.)

In its analysis, the Senate Judiciary Committee addressed a comment by the State Bar's family law section, which proposed "further amendments that would permit unilateral use of community, quasi-community and separate property to pay attorney's fees and costs beyond the retainer fee that would be permitted under this bill," so as to reduce the number of hearings in family court. The committee observed that such an expansion "could, in some cases, cause diminishment of community assets." (Sen. Com. on Judiciary, com. on Sen. Bill No. 357 (1999-2000 Reg. Sess.) as amended Mar. 18, 1999.) It made clear that attorney fees and costs *beyond the retainer fee* could be taken

13

care of by court order, or existing law requiring an advanced five days notice to the other party of any "extraordinary expenditures" with an accounting to the court.  (*Ibid*.)[6]

The legislative analyses of the subdivision (a)(2) exception to the ATRO's within section 2040 demonstrate that in using the phrase "in order to retain legal counsel in the proceeding," the Legislature referred to the initial hiring of counsel, and not fees and costs incurred thereafter to maintain counsel in the action, which must be approved by court order or other mechanism with notice to the other party in the proceeding.  This construction comports with the purpose of the ATRO's to prevent the waste or concealment of community assets by a party to pay ongoing legal fees in a dissolution

---

[6]     More fully, the Senate Judiciary Committee analysis states:  "Existing law requires advanced 5-days' notice to the other party of any 'extraordinary expenditures' and requires an accounting to the court of such expenditures.  Attorney's fees and costs beyond the retainer fee can be taken care of under this 'extraordinary expenditures' provision, or by obtaining a court order.  [¶]  The suggested expansion of the bill would circumvent the existing mechanism by which the court monitors 'extraordinary expenditures,' i.e., those beyond the usual course of business and for the necessities of life.  Thus, while perhaps reducing the number of hearings at which authorization for further use of community, quasi-community or separate property is requested, the suggestion made by the State Bar Family Law Section would allow attorneys to charge fees and costs without regard to the accounting requirements of the court and without prior notice to the other party of the use of community or quasi-community assets."  (Sen. Com. on Judiciary, com. on Sen. Bill No. 357 (1999-2000 Reg. Sess.) as amended Mar. 18, 1999.)
        We observe that other committee analyses support the conclusion that the Legislature used the terms "retain" and "retainer" to refer to the initial hiring of counsel in the proceeding.  (See Assem. Com. on Judiciary, Analysis of Sen. Bill No. 357 (1999-2000 Reg. Sess.) as amended Mar. 18, 1999 [stating in a "summary" that the bill "[a]llows a party to a dissolution to use or encumber that party's separate property or quasi-community property *to hire an attorney in a dissolution proceeding*, and requires the party to account for that use" and also stating, "The author introduced this bill to correct what seems to be an oversight in the law and *ensure that neither party to a dissolution proceeding is unnecessarily deprived of adequate representation*"], italics added.)

14

proceeding, beyond the initial retainer. Finally, William's reading of the statute as permitting the payment of any ongoing attorney fees and costs after the initial hiring of counsel would eliminate or render superfluous the phrase "in order to retain legal counsel in the proceeding" from the statute, violating basic tenets of statutory construction. (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1038-1039 ["It is a maxim of statutory interpretation that courts should give meaning to every word of a statute and should avoid constructions that would render any word or provision surplusage. . . . 'An interpretation that renders statutory language a nullity is obviously to be avoided' "].)

Because William's actions in assigning and pledging his interest in the funds was not for the purpose of retaining Higgs but to pay Higgs's ongoing fees and costs in the proceeding, the trial court correctly found they violated the terms of the ATRO barring transfer or hypothecation of property, which remained in effect until the final division of William and Saracia's assets. As a consequence, the assignment and corresponding pledge agreement was voidable on Saracia's motion. A transfer of property in violation of an injunction is voidable. (See, e.g., *Powell v. Bank of Lemoore* (1899) 125 Cal. 468, 472 [involving a sale of real property]; *Warburton v. Kieferle* (1955) 135 Cal.App.2d 278, 283.) "In such case, upon a proper showing by a party entitled to the consideration of a court of equity, relief may be granted by setting aside such sale." (*Powell v. Bank of*

15

*Lemoore*, at p. 472.)[7]  Having concluded the court correctly invalidated Higgs's

purported interest, we do not reach Higgs's remaining contentions.

---

[7]  We reject as without merit Higgs's argument that William's arrangement was nothing more than a commonplace charging lien.  The treatise cited by Higgs explains that such a lien against a future award or settlement is contractual, and "may only be enforced by counsel in an independent action *against the client* (counsel has no right to intervene in the main action to establish the amount of the lien or enforce it)." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2015) ¶ 1:280b, italics added, some italics omitted; see also *Mojtahedi v. Vargas* (2014) 228 Cal.App.4th 974, 977-978; *Bandy v. Mt. Diablo Unified Sch. Dist.* (1976) 56 Cal.App.3d 230, 234.)  The treatise additionally emphasizes that "charging liens *may not be enforced during pendency of the proceedings . . . .*"  (Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 1:285, some italics added.)  Finally the treatise warns about ethical implications of taking a *secured* promissory note for fees, as Higgs did here:  "Counsel may ethically accept the client's *unsecured* promissory note in payment of fees; this arrangement violates no public policy because, if a fee dispute arises, the attorney may enforce the note against the client's assets only through a judicial proceeding where the court will scrutinize the fairness of the transaction.  . . .  But taking a *secured* promissory note from a client is a far different matter[.]"  (Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 1:287.)  One such problem recognized by the authors is the concern over the ATRO's.  (Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 1:300 et seq.)  They point out, with respect to a real property lien, that "[a] family law attorney's real property lien given *before* commencement of the proceeding would, of course, not implicate the § 2040(a)(2) TRO.  Likewise, though § 2040(a)(2) does not expressly exempt a § 2033 lien, the statute's broad exemption for the payment of attorney fees and costs to 'retain' legal counsel in the proceeding (above) should protect enforceability of such a lien after the TRO is in effect.  This seems especially true once the court passes on the validity of the lien pursuant to §§ 2033 and 2034 . . . .  [See . . . § 2040(a)(2)—TRO bars unilateral encumbrance *without court order*]."  (Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 1:300.)  William's assignment and pledge of a secured interest in the insurance proceeds, given *after* commencement of the proceeding and not for the purpose of paying an initial retainer, gives rise to these concerns.

## DISPOSITION

The order is affirmed.  Saracia Shannahan shall recover her costs on appeal.


O'ROURKE, J.

WE CONCUR:


BENKE, Acting P. J.


NARES, J.

17