Filed 6/15/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re CASTLEPOINT NATIONAL INSURANCE COMPANY in Liquidation. | |
| RICARDO LARA, as Insurance Commissioner, etc., <br><br> Plaintiff and Respondent, <br> v. <br> CASTLEPOINT NATIONAL INSURANCE COMPANY et al., <br><br> Defendants and Respondents; <br> ALESCO PREFERRED FUNDING VIII, LTD., et al., <br><br> Claimants and Appellants. | A158646 <br><br> (San Francisco City and County Super. Ct. No. CPF16515183) |

This case concerns the scope of injunctions and releases from a California insurance insolvency proceeding and whether they bar claims in a New York lawsuit. The appellants here are some of the plaintiffs in the New York lawsuit.[1] They requested clarification from the San Francisco Superior

---

[1] The appellants are Alesco Preferred Funding VIII, Ltd., Alesco Preferred Funding XI, Ltd., Alesco Preferred Funding XII, Ltd., Alesco Preferred Funding XIV, Ltd., Hildene Opportunities Master Fund II, Ltd., NFC Partners, LLC, Wolf River Opportunity Fund LLC, Wolf River Partner Fund, and WT Holdings, Inc. The complaint in the New York lawsuit names additional entities not listed as appellants here. We presume the difference

Court as to whether its orders "prohibit or stay" their New York claims. In the insolvency case, the trial court appointed the California Insurance Commissioner (Commissioner) as conservator, and later as liquidator, of CastlePoint National Insurance Company (CastlePoint). As part of this process, the court issued injunctions and approved releases pertaining to claims filed against or on behalf of CastlePoint or its assets.

In May 2019, the San Francisco Superior Court denied the New York Plaintiffs' motion, finding "all but one of . . . ten causes of action in the New York Action are barred by the . . . injunctions issued by this Court and releases approved by this Court in the underlying CastlePoint liquidation proceedings." The New York Plaintiffs appeal.

Having reviewed the parties' briefs and the record, including requested supplemental briefing, we conclude that some of the causes of action in the New York lawsuit are not barred. The causes of action that may proceed are those relating to: (i) the alleged breach of so-called "successor obligor provisions"; and (ii) an alleged $143 million payment from ACP Re, Ltd. (ACP) to shareholders of Tower Group International, Ltd. (Bermuda) (TGIL). These causes of action are not asserted against CastlePoint or the insurance companies that were merged into it. There is no indication the Commissioner could have asserted these causes of action on behalf of the insolvent insurance companies. As a result, permitting them to proceed in New York will not interfere in any meaningful way with the plan for CastlePoint's liquidation, especially given the New York Plaintiffs' agreement not to assert any judgment against the insolvent insurance companies' estate or assets. (*Webster v. Superior Court* (1988) 46 Cal.3d 338, 350–351 (*Webster*).)

_____

is not material to the questions we address. Even though there are additional plaintiffs in New York, we refer to the appellants collectively as the "New York Plaintiffs."

2

But, as we further explain, prior to entering into releases, the Commissioner could have asserted fraudulent conveyance causes of action and a cause of action for unjust enrichment because they are based on alleged improper transfers of assets of the insolvent insurance companies. Those causes of action are barred by the injunctions and releases in the liquidation proceeding. As a result, we affirm in part and reverse in part the trial court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

I. *The California Insolvency Proceeding*

In July 2016, the Commissioner petitioned to be appointed as conservator of CastlePoint pursuant to section 1011 of the Insurance Code.[2] The petition explained that CastlePoint was a property and casualty insurer owned by Tower Group Inc. (TGI) and an affiliate of an insurance holding company that consisted of ten insurance companies from six different states (the Tower Insurance Companies).[3] TGIL was their ultimate parent company.[4]

Due to concerns in 2013 about the financial condition of the Tower Insurance Companies, TGIL's stock price declined, and TGIL "began considering options for a sale." In 2014, ACP, a reinsurer, acquired TGIL and

---

[2] Undesignated statutory references are to the Insurance Code.

[3] The ten insurance companies were CastlePoint, Tower Insurance Company of New York, Tower National Insurance Company, Hermitage Insurance Company, CastlePoint Florida Insurance Company, North East Insurance Company, Massachusetts Homeland Insurance Company, Preserver Insurance Company, York Insurance Company of Maine, and CastlePoint Insurance Company.

[4] In their complaint, the New York Plaintiffs refer to this entity as "Tower Group International, Ltd." They alleged it "is a company organized and existing under the laws of Bermuda." We presume it is the same TGIL referred to in the Commissioner's petition.

its subsidiaries, including the ten insurance companies.  The Michael Karfunkel Family 2005 Trust (Karfunkel Trust) is the beneficial owner of ACP.  As explained in the petition, ACP "immediately entered into several related post-closing transactions with AmTrust Financial Services, Inc." (AmTrust) "and National General Holdings Corp." (National General) "under which certain operating assets of the Tower Insurance Companies were sold to AmTrust (commercial lines insurance assets) and to National General (personal lines insurance assets)."  The transaction involved affiliates of AmTrust and National General agreeing "to pay up to $250 million in additional policyholder claims."

Over the next 15 months, the financial condition of the ten insurance companies continued to deteriorate.  In 2016, the Tower Insurance Companies, TGIL, and ACP worked with insurance regulators from six states "to develop a plan to address the increasingly distressed financial condition of the Tower Insurance Companies in a manner that would best protect policyholders and other creditors."  They agreed the ten insurance companies would be merged into CastlePoint, which the Commissioner would then place into conservatorship.  "The primary purpose of this consolidation was to allow for an efficient and orderly conservation process by obviating the need for ten receivership proceedings (one for each of the ten Tower Insurance Companies) in six different domiciliary states."

With the approval of insurance regulators from the other states, the Tower Insurance Companies were merged into CastlePoint.  After these mergers, the Commissioner petitioned for appointment as conservator of CastlePoint.

4

A.     *The Injunctions in the Insolvency Proceeding*

In July 2016, the Commissioner was appointed as conservator. In the conservation order, the trial court vested in the Commissioner title to all property and assets of CastlePoint, including rights of action. The conservation order contains a number of injunctions. In paragraphs 4, 8, 21, and 22, it enjoins legal proceedings or conduct "interfering with" the conservator's possession or management of CastlePoint property or assets.

Around the same time, the Commissioner entered into a conservation agreement with a number of entities including AmTrust, National General, and the Karfunkel Trust. In the motion seeking approval of the conservation and liquidation plan, the Commissioner explained that approximately $200 million "will be injected into CastlePoint by several parties to the Conservation Agreement" to provide it "with much needed liquidity to ensure that policy claims and benefits will continue to be paid during the conservation period, while the Conservator prepares for the eventual liquidation of CastlePoint and the resulting transfer of all claims to the appropriate state insurance guaranty associations . . . . The Conservation Agreement also provides for CastlePoint to receive run-off administration services (policy administration and claims administration) free of charge for up to two years, at an estimated value to CastlePoint of as much as $40 million."

Sections 8.1.2(vii) and (viii) of the conservation agreement provide that the final conservation order will enjoin "all creditors and other interested parties" from pursuing, "without prior Conservation Court approval," claims against entities including the Karfunkel Trust, ACP, AmTrust, and TGIL, that arise out of "any act or omission by any such Person in connection with the business or affairs of [CastlePoint] or the Constituent Companies."

5

After a hearing in September 2016, the trial court entered an order approving the conservation and liquidation plan (plan approval order). This order provides that "the accompanying Conservation Agreement and the Conservation Transaction Agreements are hereby fully and finally approved and enforceable in accordance with . . . their provisions, said provisions being hereby incorporated into this Order." Paragraph 16 provides that "[a]ll prior injunctions and other orders of this Court, except to the extent expressly modified herein, are reaffirmed and remain in full force and effect."

Paragraph 22 of the plan approval order contains a broad injunction. It provides that "[a]ll creditors of CastlePoint and other interested parties . . . are hereby expressly enjoined from asserting or prosecuting, without the prior approval of this Court, any legal proceeding against" the Karfunkel Trust, AmTrust, National General, and others, "arising out of . . . the management or operations of CastlePoint or its affiliates prior to the closing of the transactions contemplated by the Conservation Agreement and the Conservation Transaction Agreements."

Paragraph 23 contains a narrower injunction prohibiting actions against TGIL "in connection with the business or affairs of CastlePoint or the insurance companies later merged into and with CastlePoint that (1) arises out of any acts or omissions of such persons occurring after the consummation of the series of transactions by which [ACP] acquired [TGIL] and its affiliated insurance companies, and (2) may adversely affect the assets and operations of CastlePoint, the companies merged with and into CastlePoint, or the Plan."

In March 2017, after a hearing on the liquidation plan, the trial court found CastlePoint insolvent, terminated the Commissioner's status as conservator, and appointed the Commissioner as liquidator (liquidation

6

order).  Title to all assets of CastlePoint was vested in the liquidator, including rights of action.

Paragraphs 20, 21, 22, and 23 of the liquidation order enjoin legal proceedings or conduct "interfering with" the liquidator, including the liquidator's possession or management of CastlePoint property and assets.  In a handwritten addition, the trial court provided "the injunctions set forth in paragraph 21 of this Order are not intended to stay any action against third parties not insured or indemnified by CastlePoint, provided that the parties in such action shall not pursue, directly or indirectly, recovery on any resulting judgment from CastlePoint, its assets, or the Liquidator."

B.     *The Releases in the Insolvency Proceeding*

In September 2016, in conjunction with the conservation agreement, the Commissioner entered into a release agreement.  In section 1.01(a)(i), the Commissioner released the Karfunkel Trust, ACP, AmTrust, National General, and other entities, but not TGIL and its subsidiaries, from claims "that the Conservator or [CastlePoint] now has, owns, or holds, or at any time had, owned, or held, or may after the execution of this Agreement have, own, or hold, against any of them in connection with the business or affairs of [CastlePoint] or the Constituent Companies."

Section 1.01(a)(ii) contains a more limited release that applies to TGIL, releasing it and its subsidiaries' directors, officers, and other representatives from claims "that the Conservator or [CastlePoint] now has, owns, or holds, or at any time had, owned, or held, or may after the execution of this Agreement have, own, or hold, against any of them, arising out of any acts or omissions of such persons occurring after the consummation of the Acquisition Transactions in connection with the business or affairs of [CastlePoint] or the Constituent Companies."

In addition, in section 1.01(b) of the release agreement, the Commissioner released any claim "that the Acquisition Agreements [from 2014] are subject to avoidance as a fraudulent conveyance (as such term is defined in Section 1034.1 of the California Insurance Code)."[5]  In the plan approval order, the trial court approved the conservation agreement and the conservation transaction agreements and incorporated their provisions.

## II.    *The New York Complaint*

In October 2017, the New York Plaintiffs filed a lawsuit in New York against numerous entities and individuals, including ACP, AmTrust, National General, TGI, TGIL, the Karfunkel Trust, and members of the Karfunkel family.  The New York Plaintiffs alleged they held trust preferred securities that defaulted in payment as a result of the "stripping" of valuable assets from the Tower entities and they sought to recover their losses.

The New York Plaintiffs "are holders of trust preferred securities" (TruPS) "with an aggregate principal amount of $175 million."  TruPS are a form of security issued by trusts created by the borrower.  Investors purchase TruPS from the trust and the purchase proceeds go to the borrower in exchange for debenture securities.  Issuing TruPS is a "tax efficient" way for insurance companies to maintain surplus capital because "TruPS are treated like equity for calculating a company's capital surplus and like debt for tax purposes."

---

[5] The acquisition agreements relate to the 2014 transactions whereby, after ACP acquired TGIL, assets of the ten insurance companies were transferred to AmTrust and National General.  The release agreement provides that the acquisition agreements include "the Amended and Restated Commercial Lines Master Agreement by and between ACP Re, Ltd. and AmTrust Financial Services, Inc., dated as of July 23, 2014," and "the Amended and Restated Personal Lines Master Agreement by and between ACP Re., Ltd. and National General Holdings Corp., dated as of July 23, 2014."

The borrower's "obligations are principally set forth in an indenture governing the debentures issued to the trust. . . . The indentures typically contain successor obligor provisions that restrict the borrower from merging, selling, or conveying . . . its stock, property, or assets . . . unless the purchaser . . . expressly assumes the borrower's debenture obligations." The borrowers also issued guarantees.

"Defendants Tower Group, Inc.; Preserver Group, Inc.; CastlePoint Bermuda Holdings, Ltd.; and CastlePoint Management Corp. (the 'Tower TruPS Issuers') created affiliated trusts . . . that issued the TruPS held by Plaintiffs in this action." "The Tower TruPS Issuers are subsidiaries of" TGIL.

In 2013, the Tower Group revealed it needed "to increase its loss reserves by over $400 million." As explained in the complaint, "[l]oss reserves are a critical measure of financial health for an insurance company because the reserves represent expected future amounts that the company will be required to pay on its policies." In June 2014, "reflecting Tower Group's inability to pay its debts as they became due, Tower Group began deferring interest payments on the debentures underlying the Tower TruPS."

It was alleged that members of the Karfunkel family devised a scheme to acquire the "Tower Group's valuable business assets . . . without having to pay or assume any obligations under the Tower TruPS Indentures, in violation of provisions in the indentures." The Karfunkel entities allegedly "at the center of the illegal conduct" are ACP, AmTrust, and National General.

In 2014, ACP acquired TGIL for $143 million, and the deal involved transferring assets to AmTrust and National General. TGIL allegedly accepted this deal over the proposal of another bidder, even though the

9

alternative bid would have "permitted Tower Group to maintain its valuable assets while protecting Tower Group's debt holders, including Tower TruPS holders." The sale "benefited TGIL's shareholders over debt holders." The Karfunkels and TGIL failed "to require ACP, AmTrust, or National General to pay or assume the Tower TruPS Issuers' obligations under the Tower TruPS Indentures as part of the Karfunkel acquisitions."

The New York complaint acknowledged the existence of the California insolvency proceedings, recognizing that, in 2016, "the Tower TruPS Issuers' insurance subsidiaries" were placed into conservation and liquidation. According to the complaint, these insurance subsidiaries "were all subsidiaries of the Tower TruPS Issuers and held substantially all of the issuers' remaining assets, though at this point in time substantially all of the valuable assets of the issuers had already been transferred to AmTrust and National General."

In summary, the New York Plaintiffs alleged "the Karfunkels paid Tower Group's shareholders . . . $143 million to cede control to the Karfunkels so they could strip away Tower Group's 'well-performing book of business,' which realized hundreds of millions in net value to the Karfunkels in 2014 and 2015 alone, while leaving Tower Group with its poorest-performing policies and over $228 million in Tower TruPS obligations." The New York Plaintiffs asserted ten causes of action, including breach of contract, tortious interference with contractual relations, breach of fiduciary duty, fraudulent conveyance, unjust enrichment, and claims of alter ego and successor liability.

III.    *The Request for Clarification and the Trial Court's Order*

In response to this complaint in New York, the defendants filed motions to dismiss arguing the noncontract claims belonged to the

10

Commissioner and were enjoined by orders in the California liquidation proceedings. In August 2018, the New York court stayed the case pending the plaintiffs obtaining an order from the California court clarifying that the New York action is not enjoined.[6]

In November 2018, the New York Plaintiffs filed a motion in San Francisco Superior Court seeking an order "clarifying that the orders" in the insolvency proceedings "do not prohibit or stay" the New York action. ACP and other entities and individuals named as defendants in the New York action (collectively, the New York Defendants) opposed the motion.[7] They argued the San Francisco Superior Court's injunctions and releases bar the New York Plaintiffs' tort claims.

In response to the motion, the Commissioner filed a "Statement of Position." The Commissioner acknowledged the New York Plaintiffs were "not directly pursuing the assets of the CastlePoint estate." Consistent with *Webster*, *supra*, 46 Cal.3d at pages 350 to 351, the New York Plaintiffs "have agreed not to assert any judgment against CastlePoint." As the result, the Commissioner determined the injunctions may not bar the New York Plaintiffs' claims. But the Commissioner indicated the court should prohibit the New York Plaintiffs from pursuing released claims.

---

[6] In their opening brief, the New York Plaintiffs state the stay was lifted in the New York action and they amended their complaint. We address some implications of this development in Discussion, section I, *post*.

[7] The New York complaint names individuals, trusts, and other organizations that are not named here as respondents. Furthermore, twelve of the defendants named in the original complaint are no longer part of the amended complaint in New York. Even though there is not a complete overlap, we refer to the entities and individuals who opposed the motion in California as the New York Defendants.

The trial court held a hearing on the motion in March 2019. At the hearing, counsel for the Commissioner reiterated that, so long as the New York Plaintiffs made "a binding election not to pursue the assets of CastlePoint, pursuant to the *Webster* decision," their claims did not appear to violate the injunctions, but they nonetheless may violate the release agreement. At the hearing, for the first time, the New York Defendants argued that *Avikian v. WTC Financial Corp.* (2002) 98 Cal.App.4th 1108 (*Avikian*) barred the claims. After hearing argument from the parties, the court ordered supplemental briefing.

In its supplemental statement, the Commissioner's position was more definitive. It stated the New York Plaintiffs' tort claims "originate from the lack of funds available to pay the TruPS obligations as a direct result of the purportedly improper removal of assets from CastlePoint and the Constituent Companies around 2014 allegedly resulting in their insolvency. The . . . tort claims appear either to have been released by the Commissioner, or to be unreleased claims that still belong to the Commissioner, as conservator and then liquidator of the CastlePoint estate, and are enjoined by the Court's prior orders."

In May 2019, the trial court denied the motion. The court concluded that "all but one of . . . ten causes of action in the New York Action are barred by the outstanding injunctions issued by this Court and releases approved by this Court in the underlying CastlePoint liquidation proceedings." As the trial court explained, "[j]ust as in *Avikian*, the gist of [the New York Plaintiffs'] claims in the New York Action is that [the New York Defendants] looted the assets of CastlePoint, the liquidated entity, and their alleged injuries therefore are incidental to CastlePoint's injury." The New York

12

Plaintiffs filed a motion for reconsideration, which, after a hearing in August 2019, the trial court denied. The New York Plaintiffs appeal.

DISCUSSION

On appeal, the New York Plaintiffs argue their claims in the New York action do not violate the injunctions or the releases in the California insolvency proceedings. We agree in part with the New York Plaintiffs.

I. *Preliminary Considerations*

The trial court denied the New York Plaintiffs' "Motion for Order Clarifying the CastlePoint Stay Does Not Apply to New York Action." In doing so, the trial court concluded that most of the causes of action in the New York complaint "violate the terms of this Court's injunctions and court-approved releases, and may not be pursued by" the New York Plaintiffs. The order enforces the injunctions or releases previously entered and therefore we construe it as the functional equivalent of an injunction; it enjoins or prohibits the New York Plaintiffs from pursuing certain claims in New York.

The nature of this order governs our standard of review. "Courts have discretion to determine whether to stay an action against the insolvent insurer and, if so, under what terms and conditions." (*Webster*, *supra*, 46 Cal.3d at p. 350.) At the same time, it is "solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) In addition, "whether the trial court correctly determined its jurisdiction and authority under the" Insurance Code is a legal question that we review independently. (*Garamendi v. Executive Life Ins. Co.* (1993) 17 Cal.App.4th 504, 513.)

The New York Defendants claim there may not be an appealable final judgment because the New York Plaintiffs "have not disclaimed the

13

possibility that they will go back to the Superior Court for relief from its injunctions if they are unsuccessful on this appeal." But the New York Plaintiffs state the trial court's order terminates the action and nothing remains to be litigated in California. Accordingly, we presume the New York Plaintiffs will not seek further relief from the trial court.

We further note that the New York Plaintiffs filed an amended complaint in New York. At oral argument we questioned whether this development moots this appeal. We requested supplementing briefing, including a copy of the amended complaint, and a joint statement regarding the status of then-pending motions to dismiss. In their joint statement, the parties explained that the New York trial court ruled on the motions to dismiss on March 26, 2021, and the parties attached a copy of the decision.

As neither the amended complaint nor this decision was part of the record below, we, on our own motion, take judicial notice of them. (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1 ["a reviewing court may take judicial notice of matters not before the trial court, including records of another court"].) Among other changes, the amended complaint adds a second breach of contract claim based on the payment of $143 million to shareholders of TGIL, and a fraud claim based on an alleged misrepresentation in a proxy statement.

In its March 2021 decision, the New York court determined that the California injunctions do not bar the New York Plaintiffs' breach of contract claims or their tortious interference with contract claim because it is "also a claim relating to the alleged breach of contract," and it is not asserted against the insurance companies involved in the conservatorship. However, pending this appeal, the New York court accorded full faith and credit to the

14

California trial court's determination that many of the tort claims asserted in the original complaint were barred.

Here, we offer additional guidance regarding the types of claims that the New York Plaintiffs can and cannot pursue as a result of the insolvency proceedings. Absent a substantial risk of interference with the Commissioner or the liquidation proceedings, if the claims are not asserted against CastlePoint, and if the Commissioner could not have asserted the claims on behalf of CastlePoint, then they are not barred by the injunctions preventing interference with the Commissioner's possession or management of CastlePoint assets. A corollary is that the injunctions and releases do bar the New York Plaintiffs from asserting claims the Commissioner could have pursued as conservator of CastlePoint.

II.    *Statutory Framework and Governing Law*

"Although the Constitution gives to Congress the power to provide for bankruptcies, the Congress has determined that insurance insolvency proceedings shall be subject to state law. (11 U.S.C. § 109.)" (*Garamendi v. Executive Life Ins. Co.*, *supra*, 17 Cal.App.4th at p. 508, fn. 3.)

If the Commissioner files a verified petition indicating an insurer is found "to be in a condition that makes its further transaction of business hazardous to its policyholders, or creditors, or to the public," the appropriate superior court shall issue an order "vesting title to all of the assets" of the insurer in the Commissioner. (§ 1011.) When acting as conservator, the Commissioner "exercises the state's police power to carry forward the public interest and to protect policyholders and creditors of the insolvent insurer." (*In re Executive Life Ins. Co.* (1995) 32 Cal.App.4th 344, 356.) "In exercising this power, the Commissioner is vested with broad discretion. [Citation.] This discretion is subject to statutory limitations [citation] and the

15

requirement that the exercise of discretion be neither arbitrary nor improperly discriminatory." (*Ibid.*)

Once the Commissioner is appointed as conservator or liquidator, section 1020 "provides that . . . the court has broad powers to enjoin numerous acts, including the following: (1) interference with the Commissioner or the proceeding, (2) waste of the company's assets, (3) the institution or prosecution of any actions or proceedings, (4) the obtaining of preferences, judgments, attachments, or other liens against the company or its assets and (5) the making of any levy against the company or its assets." (*Garamendi v. Executive Life Ins. Co.*, *supra*, 17 Cal.App.4th at p. 514.) This section "grants the supervising court broad powers to prevent interference with the conservatorship, including the power to enjoin other matters." (*Jones v. Golden Eagle Ins. Corp.* (2011) 201 Cal.App.4th 139, 146, fn. 5.) "Section 1020 reflects a legislative intent to preserve an insolvent insurer's assets for orderly disposition by the commissioner." (*Webster*, *supra*, 46 Cal.3d at p. 344.)

The Commissioner's powers as conservator or liquidator include the authority to "prosecute and defend any and all suits and other legal proceedings, and execute, acknowledge and deliver any and all deeds, assignments, releases and other instruments necessary and proper to effectuate any sale of any real and personal property or other transaction in connection with the administration, liquidation, or other disposition of the assets" of the insurer. (§ 1037, subd. (f).) Like federal bankruptcy law, the purpose of California's insurance insolvency provisions is "to ensure the equitable distribution of an insolvent debtor's property among creditors, but it also has 'the additional and more urgent purpose of protecting an insurance company's policyholders, as well as its creditors, by preventing

16

dissipation of the company's assets when it is found by the Commissioner to be in a hazardous condition.' " (*State of California v. Altus Finance* (2005) 36 Cal.4th 1284, 1304.)

    III.    *The Injunctions and Releases in the Insolvency Proceedings Bar Some, but Not All, of the New York Plaintiffs' Claims*

The New York Plaintiffs claim their tort causes of action can proceed because they "involve breaches of duties owed by the Issuers and the Issuers' alter egos or successors-in-interest . . . . None of these duties was owed by CastlePoint, and plaintiffs do not seek one cent from CastlePoint's coffers." The New York Plaintiffs claim their "unequivocal *Webster* election . . . removes any conceivable basis for finding that the New York Action violates any CastlePoint injunction." Regarding the releases, the New York Plaintiffs argue they "do not seek to recover the funds looted from CastlePoint—indeed, they do not seek redress for *any* harm done *to CastlePoint.*"

We agree in part. In *Webster*, the California Supreme Court held a personal injury plaintiff was permitted to maintain a civil damages action against an insolvent insurance company's liability insurer provided he elected to recover payment of any judgment only from the liability insurer and not from the insolvent company's assets. (*Webster*, *supra*, 46 Cal.3d at p. 350.) Our high court found that allowing the action to proceed would neither deplete the insolvent insurer's assets nor disrupt an orderly distribution. (*Ibid.*)

Based on our high court's analysis in *Webster*, we focus on whether allowing the New York Plaintiffs' claims to proceed will interfere with the Commissioner by depleting the assets of the CastlePoint estate or disrupting

17

an orderly distribution of those assets.[8]  With regard to many of the New York Plaintiffs' causes of action, we discern no such risk because the claims are not against CastlePoint or claims the Commissioner could have prosecuted on behalf of CastlePoint to recover assets for the estate.  We address each group of claims asserted in the original complaint in the New York action.

A.   *The Causes of Action for Breach of Contract and Tortious Interference with Contract*

In their first cause of action, the New York Plaintiffs alleged the Tower TruPS issuers, TGIL, and ACP "failed to perform the obligations set forth in the Tower TruPS Indentures and Tower TruPS Guarantees."  More specifically, there was an alleged failure to comply with "payment obligations and the Successor Obligor Provisions of the Tower TruPS Indentures."  In their second cause of action for tortious interference, the New York Plaintiffs alleged the Karfunkel defendants "interfered with the Tower TruPS Indentures by causing the Tower TruPS Issuers to violate the Successor Obligor Provisions of the Tower TruPS Indentures."[9]

In ruling on these causes of action, the trial court noted the parties agree "the first cause of action for breach of contract . . . is not barred by the Plan Approval Order, the Liquidation Order, or the Releases."  However, without analysis, the trial court added the cause of action "appears to be

---

[8] We do not adopt one argument made by the New York Plaintiffs in their supplemental briefing to the extent it suggests that the authorization in section 1020 to enjoin "[i]nterference with the commissioner or the proceeding" is limited to interference resulting from depleting the assets of the insolvent insurer.  Under the facts of this case, we conclude there is no significant risk of interference when third party litigation does not require the active involvement of the Commissioner.

[9] The Karfunkel defendants are defined in paragraph 50 of the complaint as including ACP, AmTrust, National General, the Karfunkel Trust, and various members of the Karfunkel family.

18

barred" if asserted against TGIL and ACP. Then, relying primarily on *Avikian, supra,* 98 Cal.App.4th at pages 1112 to 1116, the trial court found the tort causes of action were also "barred by the outstanding injunctions issued by this Court and [the] releases approved by this court in the underlying CastlePoint liquidation proceedings."

We disagree. The New York Defendants concede the TruPS holders' claim for breach of contract against the TruPS issuers " 'is not a claim belonging to the estate.' " The New York Plaintiffs alleged the terms of the indentures require successors or acquirers to assume the obligations. Based on the contract terms, if the New York Plaintiffs can assert a breach of contract claim against the TruPS issuers, then the claim can also proceed against TGIL or ACP, entities alleged to be the successors in interest to the TruPS issuers.

Similarly, the claim for tortious interference with contract is based on the same contracts and the New York Plaintiffs seek the same damages; namely, "all outstanding principal and accrued interest owing under the Tower TruPS Indentures and the Tower TruPS Trust Agreements." The Commissioner complains that allowing claims of this nature to proceed "would not only threaten the agreement that formed the basis of the initial Plan, it would also inject uncertainty into the Commissioner's administration of the estate." But, in the release agreement, the Commissioner only agreed to release claims he had, owned, or held. The Commissioner as conservator or liquidator of CastlePoint has no interest in the TruPS indentures or any basis for asserting a claim for tortious interference with these contracts. And given the New York Plaintiffs' *Webster* election, allowing the claim to proceed

19

creates no uncertainty about whether its resolution will impact the assets of the CastlePoint estate.[10]

In concluding otherwise, the trial court relied on *Avikian*, *supra*, 98 Cal.App.4th at pages 1112 to 1116, but this reliance was misplaced. There, the Court of Appeal concluded the plaintiffs' claims were barred because they were derivative in nature, and they constituted "claims made on behalf of" the insolvent insurance company. (*Id.*, at p. 1111.) We recognize that here, as in *Avikian*, the original complaint contains allegations regarding the alleged "stripping" or looting of assets from the underlying insurance companies, allegations that often cloud the nature of the claims being asserted. But, in our view, the alleged failure to honor successor obligor provisions does not depend on the alleged looting of assets from the underlying insurance companies, nor is there any suggestion the Commissioner could have pursued, for example, a tortious interference with contract claim to recover assets for the estate. As a result, *Avikian*, at pages 1112 to 1116, which concerned claims that belonged to the Commissioner, is distinguishable. For the same reason, the federal bankruptcy cases cited by the New York Defendants are distinguishable because they concern claims that only the bankruptcy trustee could pursue as property of the debtor's estate. (See, e.g., *In re Emoral, Inc.* (3d Cir. 2014) 740 F.3d 875, 879.)

---

[10] The Commissioner makes the remarkable assertion that allowing the New York Plaintiffs' claims to proceed (other than the contract claim) "would be inequitable" because it would "deny the [New York] Defendants the benefit of their bargain . . . purchased at a cost of over $200 million." If the Commissioner is suggesting he is authorized to sell protection from third party claims that will not interfere with the liquidation of CastlePoint, he is mistaken. The Commissioner cites no authority for this proposition, and we cannot imagine it exists.

Despite some loose pleading in the original complaint, we also disagree with the Commissioner's position that claims "based on the successor obligor provisions of the securities and the $143 million shareholder payment . . . are derivative of alleged harms to the CastlePoint estate." These claims may be factually related to the alleged stripping of assets from the underlying insurance companies, but they allege independent wrongful conduct. Even if there was nothing improper about the transfer of assets from the underlying insurance companies to AmTrust and National General in 2014, the New York Plaintiffs can still claim to have been harmed by the breach of the successor obligor provisions and the $143 million payment to TGIL shareholders. Of course, we offer no opinion on the merits of these claims. Our point is simply that the New York Plaintiffs allege damages that are not "merely incidental to the alleged harm inflicted upon" the underlying insurance companies. (*Avikian, supra*, 98 Cal.App.4th at p. 1116.)

We recognize that paragraph 22 of the plan approval order contains a broad injunction, enjoining "[a]ll creditors of CastlePoint and other interested parties" from asserting or prosecuting, "without the prior approval of this Court, any legal proceeding against" the Karfunkel Trust, AmTrust, National General, and others, "arising out of . . . the management or operations of CastlePoint or its affiliates prior to the closing of the transactions contemplated by the conservation agreement and the Conservation Transaction Agreements." Similarly, sections 8.1.2(vii) and (viii) of the conservation agreement contain broad injunctions prohibiting claims against entities including the Karfunkel Trust, ACP, AmTrust, and TGIL, that arise out of "any act or omission by any such Person in connection with the business or affairs of [CastlePoint, and] . . . the Constituent Companies."

21

But causes of action based on the failure to honor the obligations in the TruPS contracts do not concern the management, operations, business, or affairs of the underlying insurance companies. They are outside the scope of these injunctions. Instead, they are consistent with the handwritten carve-out added to the liquidation order because they are not asserted against entities "insured or indemnified by CastlePoint," and the New York Plaintiffs have agreed not to seek "recovery on any resulting judgment from CastlePoint, its assets, or the Liquidator." In sum, allowing the contract-based claims to go forward against the TruPS issuers, TGIL, ACP, or the Karfunkel defendants will not deplete the assets of the CastlePoint estate or disrupt an orderly distribution of those assets in the CastlePoint liquidation. (*Webster*, *supra*, 46 Cal.3d at p. 350.) For these reasons, the claims are not barred.[11]

B. *The Causes of Action for Breach of Fiduciary Duty*

In the third cause of action, the New York Plaintiffs alleged ACP, and various groups of director and officer defendants, breached their fiduciary duties to the TruPS holders by, among other things, "providing for substantial payments to shareholders of TGIL without providing for the assumption or adequate means for repayment of the debentures underlying the Tower TruPS Indentures." In their fourth cause of action, it was alleged the Karfunkel defendants aided and abetted these breaches of fiduciary duty.

Clearly, these causes of action are not against CastlePoint, nor is there any indication the Commissioner could have pursued them on behalf of

_____

[11] The Commissioner expresses concern regarding "the costs associated with monitoring and ensuring that the extensive litigation [in New York] does not encroach on the CastlePoint estate, or upon the Commissioner's agreements." However, based on the terms and conditions we impose below, we conclude these costs will not be extensive.

CastlePoint. We acknowledge, as the New York Defendants point out, that the allegations in the original complaint often intertwine the alleged improper payment to TGIL shareholders with the alleged looting of the CastlePoint assets. Nevertheless, we discern no necessary connection between the two. Indeed, the New York Defendants concede "a claim that the Plaintiffs have a right to the $143 [million] payment that ACP made to TGIL's shareholders would not, standing alone, be property of the estate." So construed, we are not persuaded that allowing these claims to proceed in New York will deplete the assets of the CastlePoint estate or disrupt the liquidation plan. (*Webster*, *supra*, 46 Cal.3d at p. 350.) As a result, the breach of fiduciary duty causes of action are not barred.

C. *The Fraudulent Conveyance Causes of Action*

The fifth, sixth, and seventh causes of action alleged the Tower TruPS issuers made conveyances to the Karfunkel defendants at a time when the issuers were insolvent, or that they were made insolvent by these conveyances, and the sixth cause of action refers to the transfer of assets to ACP, AmTrust, and National General, and the "cherry-picking" of "valuable Tower Group assets while leaving poorly performing assets." The New York Plaintiffs "seek to avoid all . . . conveyances made by the Tower TruPS Issuers to the Karfunkel Defendants." They also seek to hold the "Karfunkel Defendants, the Tower TruPS Issuers, and TGIL . . . liable . . . for damages incurred as a result of their participation in the conspiracy to commit fraudulent conveyance of the Tower TruPS Issuers' property to ACP, AmTrust, and National General."

We agree with the trial court that the New York Plaintiffs are prohibited from asserting these causes of action in New York. By statute, the Commissioner has the power to avoid fraudulent transfers. (§ 1034.1.) In

23

section 1.01(b) of the release agreement, the Commissioner expressly released any claim "that the Acquisition Agreements [whereby AmTrust and National General acquired assets of the insurance companies] are subject to avoidance as a fraudulent conveyance." Accordingly, this release bars the fraudulent conveyance causes of action.

These causes of action belonged to the Commissioner. If CastlePoint or the insurance companies merged into it had rights of action based on the transfer of assets out of them, then those claims became the Commissioner's when he was appointed conservator of CastlePoint. It was the Commissioner's role to investigate the financial condition of CastlePoint and prosecute claims, if necessary, for the sake of "marshalling the assets of an insolvent insurer in order to pay claims." (*Arthur Andersen v. Superior Court* (1998) 67 Cal.App.4th 1481, 1486.)

Here, instead of prosecuting claims that belonged to the Commissioner, the Commissioner released them in exchange for significant benefits. Among other things, the Commissioner received a cash infusion of $200 million to "provide CastlePoint with much needed liquidity to ensure that policy claims and benefits [would] continue to be paid during the conservation period" while the Commissioner prepared "for the eventual liquidation of CastlePoint and the resulting transfer of all claims to the appropriate state insurance guaranty associations." Indeed, "[a]t the time it was placed into conservation . . . CastlePoint had only a few weeks of liquidity available to pay insurance claims. Accordingly, a cornerstone of the Plan was that the Karfunkel Trust agreed to pay $200 million into the estate," and related entities "would provide free claim handling services to the estate for two years, a potential $40 million benefit." We find no abuse of discretion in the Commissioner's decision to release claims associated with the transfer of

assets for the sake of effectuating an orderly conservation and liquidation of CastlePoint. (*In re Executive Life Ins. Co.*, *supra*, 32 Cal.App.4th at p. 356 [when acting as conservator, Commissioner vested with broad discretion].)

The fraudulent conveyance causes of action also violate the injunctions preventing interference with the Commissioner's possession and management of CastlePoint assets. It is not clear, for example, how any attempt to undo or remedy the alleged fraudulent conveyances would proceed—as they concerned transfers to AmTrust and National General of "renewal rights . . . for commercial lines business and . . . for personal lines business." Allowing the New York Plaintiffs to prosecute these claims in New York would likely require the Commissioner's significant involvement in this "business litigation case," thereby disrupting the liquidation plan. (*Webster*, *supra*, 46 Cal.3d at p. 353.) For these reasons, we agree with the trial court that the fraudulent conveyance causes of action are barred.

D.    *The Cause of Action for Unjust Enrichment*

In their eighth cause of action for quantum meruit, the New York Plaintiffs seek restitution because "[t]he Karfunkel Defendants benefitted when ACP, AmTrust, and National General acquired the Tower TruPS Issuers' valuable assets," and, they did so at plaintiffs' expense because "the Tower TruPS Issuers lost access to valuable assets that would have contributed to repaying Tower Group's TruPS." But, of course, as explained earlier in the complaint, these "valuable assets" were the assets of the issuers' "wholly owned insurance subsidiaries."

Like the fraudulent conveyance claims, we conclude this cause of action belonged to the Commissioner. It is asserted against the Karfunkel defendants and it is focused on the transfer of insurance assets to AmTrust and National General. The insurance companies' rights of action based on

25

those transfers became the Commissioner's when he was appointed conservator of CastlePoint. But, in section 1.01(a)(i) of the release agreement, the Commissioner, as conservator, released claims it had, owned, or held against the Karfunkel Trust, ACP, AmTrust, National General, and other entities, "in connection with the business or affairs of [CastlePoint] or the Constituent Companies."

In addition, this cause of action is barred by injunctions in the liquidation proceedings. For example, the injunctions in paragraphs 20 to 23 of the liquidation order enjoin all persons from interfering with the Commissioner's conduct of his duties as liquidator, or from "doing any act or other thing whatsoever to interfere with the possession of or management by the Liquidator of the property and assets" of CastlePoint.

There can be no doubt the court has authority to issue injunctions of this kind. As explained by our high court, "if . . . a policyholder attempted a common law action seeking restitution as a remedy to restore property lost by an insolvent insurance company, such an action would be precluded by Insurance Code section 1037, subdivision (f). The suit would fall squarely within the exclusive role of the Commissioner, as conservator and trustee, to 'prosecute and defend any and all suits and other legal proceedings' pertaining to the insolvent insurer's property and business." (*State of California v. Altus Finance*, *supra*, 36 Cal.4th at p. 1305.)

Here, in the unjust enrichment cause of action, the New York Plaintiffs seek to remedy the TruPS issuers' "lost access to valuable assets." By doing so, they seek to usurp a function that is "quintessentially within the scope of the Commissioner's power as conservator and trustee of the insolvent company." (*State of California v. Altus Finance*, *supra*, 36 Cal.4th at p. 1305.) The cause of action is barred.

26

### E. *Alter Ego and Successor Liability*

The ninth and tenth causes of action for alter ego and successor liability seek to hold members of the Karfunkel family and ACP liable for the obligations of numerous entities including the Tower TruPS issuers. To the extent these claims concern the alleged breach of the successor obligor provisions or the $143 million payment by ACP to TGIL shareholders, there is no indication that allowing them to proceed in New York will deplete the assets of the CastlePoint estate or disrupt the liquidation plan. (*Webster*, *supra*, 46 Cal.3d at p. 350.) In so concluding, we offer no opinion on the merits of these claims.

### IV. *Terms and Conditions*

"Courts have discretion to determine whether to stay an action against the insolvent insurer and, if so, under what terms and conditions." (*Webster*, *supra*, 46 Cal.3d at p. 350.) Like in *Webster*, we impose a number of terms and conditions regarding the claims that the New York Plaintiffs may pursue in New York.

First, the New York Plaintiffs must make a binding election not to seek recovery from CastlePoint assets or assets distributed or to be distributed by the Commissioner as part of the plan for CastlePoint's liquidation. Second, like the condition imposed by the trial court in its May 16, 2019 order, the New York Plaintiffs must make discovery requests, if any, informally to the Commissioner, rather than through formal legal processes that would increase the costs to CastlePoint. Having found that the claims that can proceed in New York relating to alleged breaches of the successor obligor provisions and the $143 million payment to shareholders of TGIL are distinct from the allegations of improper transfers of CastlePoint assets, we

27

anticipate that discovery requests made to the Commissioner, if any, should be minimal.

## DISPOSITION

We affirm in part and reverse in part. The California insolvency proceedings relating to CastlePoint do not bar the New York Plaintiffs from asserting the following causes of action: (i) breach of contract against the TruPS issuers, TGIL, and ACP; (ii) tortious interference with contract against the Karfunkel defendants; (iii) breach of fiduciary duty against ACP and various director and officer defendants; (iv) aiding and abetting breach of fiduciary duty against the Karfunkel defendants; (v) alter ego liability against members of the Karfunkel family and ACP; and (vi) successor liability against the Karfunkel defendants.

However, the California insolvency proceedings relating to CastlePoint bar the New York Plaintiffs from asserting the following causes of action: (i) fraudulent conveyance against the Karfunkel defendants and the Tower Group; (ii) conveyance made with intent to defraud against the Karfunkel defendants and the Tower Group; (iii) conspiracy to commit fraudulent conveyance against the Karfunkel defendants, the Tower TruPS issuers, and TGIL; and (iv) quantum meruit/unjust enrichment against the Karfunkel defendants.

With regard to the causes of action that are not barred, the New York Plaintiffs may pursue them only in accordance with the terms and conditions outlined in the opinion.

Each side shall bear its own costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

28

_____
Seligman, J.*

WE CONCUR:


_____
Simons, Acting P. J.


_____
Burns, J.


A158646


---

* Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:  San Francisco City and County Superior Court

Trial Judge:  Hon. Ethan P. Schulman

Counsel:

Murphy Rosen and Paul D. Murphy; Wollmuth Maher & Deutsch, Jay S. Handlin; Greines, Martin, Stein & Richland, Robin Meadow and Laurie J. Hepler, for Claimants and Appellants Alesco Preferred Funding VIII, Ltd., Alesco Preferred Funding XI, Ltd., Alesco Preferred Funding XII, Ltd., Alesco Preferred Funding XIV, Ltd., Hildene Opportunities Master Fund II, Ltd., NFC Partners, LLC, Wolf River Opportunity Fund LLC, Wolf River Partner Fund, and WT Holdings, Inc.

Xavier Becerra, Attorney General, Karen W. Yiu and Lucy F. Wang, Deputy Attorneys General; Orrick, Herrington & Sutcliffe, Cynthia J. Larsen, for Plaintiff and Respondent Insurance Commissioner.

Reed Smith, Jesse L. Miller and Maytak Chin; Debevoise & Plimpton, Carl Micarelli *pro hac vice*, for defendants and respondents ACP Re, Ltd., ACP Re Holdings, LLC, AmTrust Financial Services, Inc., CastlePoint Bermuda Holdings, Ltd., CastlePoint Management Corp., Integon National Insurance Company, National General Holdings Corp., Preserver Group, Inc., Technology Insurance Company, Inc., Tower Group, Inc., Tower Group International, Ltd., William F. Dove, William F. Fox, Jr., William E. Hitselberger, Michael H. Lee, Herbert Lemmer, Elliot S. Orol, William A. Robbie, James E. Roberts, Steven W. Schuster, Robert S. Smith, Jan R. Van Gorder, Austin P. Young, III, Meghan Zeigler, George Karfunkel, Leah Karfunkel, Estate of Michael Karfunkel, Barry Zyskind, Michael Karfunkel Family 2005 Trust, and Michael Karfunkel 2005 Grantor Retained Annuity Trust.